AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 4 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| United States of America | |
|---|---|
| v. | Case No. |
| JOHN SARO BALIAN, | 18 MJ 01199 |
| Defendant | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of October 10, 2017, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1001(a)(2) | Making False Statements |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/S/
*Complainant's signature*

Michael Hyland, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  5/14/2018
_____

City and state:  Los Angeles, California

ALICIA G. ROSENBERG
*Judge's signature*

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Michael Hyland, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and I have been so employed since November 2009.  From June 2009 through November 2009, I received training at the Law Enforcement Training Center.  This training included courses on conducting criminal investigations, narcotics identification, organized crime, gangs, and other law enforcement topics. Previously, I was employed as a Special Agent with the Air Force Office of Special Investigations beginning in June 2000.

2.   As an HSI agent, I have investigated complex criminal conspiracies associated with Mexican cartels, drug trafficking organizations, organized crime syndicates, and violent street gangs who committed violations of law associated with narcotics distribution, racketeering, fraud, contraband smuggling, and money laundering.  In relation to the investigation of these cases, I have led and/or participated in the execution of search warrants to seize evidence of violations of federal law and arrest warrants to apprehend individuals who commit such violations.  I have also participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, interviewing witnesses, executing search and arrest warrants, monitoring consensually-

1

recorded meetings and telephone calls, and conducting court-
authorized interception of wire communications.  Additionally, I
have learned the methods used by individuals to commit criminal
activity by interviewing numerous defendants, informants, and
other witnesses involved in criminal activity.  In this way, I
have become familiar with the methods used by individuals
involved in organized crime and gang activity to conduct various
criminal activities.  I have also become familiar with the
methods used by such individuals to avoid detection by law
enforcement, including use of cellular telephones that are
subscribed to the names of other persons; prepaid cellular
telephones; counter-surveillance techniques; coded and ambiguous
language; multiple vehicles; and false identities.  I have also
become familiar with the methods, language, structures and
criminal activities of organized crime, street gangs, and
transnational gangs operating in and through this judicial
district.

3. Since September 2015, I have been assigned to the
Federal Bureau of Investigation's ("FBI") Eurasian Organized
Crime Task Force ("EOCTF").  The EOCTF is comprised of special
agents from the FBI and other federal law enforcement agencies,
such as HSI, Internal Revenue Service - Criminal Investigation,
Health and Human Services, and federally deputized state law
enforcement officers from local agencies, including the Los
Angeles Police Department ("LAPD"), the Los Angeles County
Sheriff's Department ("LASD"), the Burbank Police Department,
the California Department of Health Care Services, and the

Glendale Police Department ("GPD"), as well as other law enforcement officials.  The EOCTF is headquartered at the GPD in Glendale, California.  I am the lead case agent for the organized crime investigation described herein.

## II. PURPOSE OF AFFIDAVIT

4.  This affidavit is made in support of an arrest warrant and criminal complaint charging JOHN SARO BALIAN ("BALIAN"), a narcotics detective assigned to the GPD, with a violation of 18 U.S.C. § 1001, False Statements to Federal Agents.  Additionally, this affidavit is made in support of search warrants for the residence of BALIAN located at 4616 Guava Avenue, Seal Beach, CA 90740 (hereinafter, the "SUBJECT PREMISES") and a cellular phone subscribed to BALIAN (hereinafter, "Balian's Personal Cell Phone").

5.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of, or investigation into, this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. PREMISES TO BE SEARCHED

6.  The SUBJECT PREMISES is a single-family home that is located on the south side of Guava Avenue, as described in

Attachment A-1, which is incorporated herein by reference. The second item to be searched is Balian's Personal Cell Phone which utilizes telephone number (714)493-8143, and is further described in Attachment A-2, which is incorporated herein by reference.

### IV. ITEMS TO BE SEIZED

7.     The items to be seized include any data that constitutes evidence, fruits, and/or instrumentalities for violations of 18 U.S.C. §§ 1962(c) and (d) (Racketeering and Racketeering Conspiracy), 18 U.S.C. § 1951 (Interference with Commerce by Robbery or Extortion); 18 U.S.C. § 1512(c)(2) (Obstruction of Justice), 18 U.S.C. § 666 (Bribery and Theft), and 18 U.S.C. § 1001 (False and Concealing Statements), as described further in Attachment B, which is also incorporated by reference.

### V. SUMMARY OF PROBABLE CAUSE

8.     In 2016, the EOCTF was investigating the relationship between the Mexican Mafia and Armenian Organized Crime in the Southern California area. During the investigation, BALIAN was identified as a person of interest and was interviewed several times. Based on my training, experience, conversations with other law enforcement officers and individuals familiar with the facts of the investigation, I believe BALIAN has obstructed justice, provided false and misleading statements to federal agents, and accepted a bribe. There is probable cause to show that BALIAN obstructed justice and provided these false and misleading statements in an effort to hide his associations and

criminal collaborations with gang members, the Mexican Mafia, and Armenian Organized Crime.

## VI. STATEMENT OF PROBABLE CAUSE

### A.   Interview of CHS-1

9.   On December 14, 2015, FBI Task Force Officer ("TFO") Antonio Cabrera and I, along with law enforcement officers assigned to Drug Enforcement Administration ("DEA"), LAPD, and the LASD, interviewed a confidential human source ("CHS-1").[1] During the interview, CHS-1 stated that he was previously

---

[1]CHS-1 has a criminal history from 1990 to August 2016. CHS-1's early criminal history through the 1990's includes trespassing, petty theft, burglary, receiving stolen property, access card theft, and criminal conspiracy. CHS-1's more recent criminal history includes the following: July 16, 2002, arrested for manufacturing of a controlled substance, and convicted on October 25, 2002 for transportation and sale of controlled substances; August 20, 2002, arrested for kidnapping for ransom and false imprisonment, convicted on November 19, 2002 for false imprisonment; July 20, 2005, arrested for reckless driving, unlicensed driver, and convicted on December 09, 2005; December 07, 2005, arrested for grand theft auto, and convicted on August 31, 2006 for grand theft auto, possession of controlled substance; May 10, 2006, arrested for vehicle theft, and convicted on February 5, 2007; May 27, 2006, arrested for several counts of grand theft and forgery, two counts of possession of firearm by felon, burglary, vehicle theft, possession of controlled substances for sale, and convicted on February 5, 2007 for identity theft, stolen credit cards, and grand theft; August 20, 2009, arrested for parole violation, possession of controlled substance for sale, and convicted for possession of forged drivers' license/identity card, identity theft; April 30, 2015, arrested for identity theft, and convicted on August 23, 2016, for vehicle theft with prior. CHS-1 received $250 for reimbursements of costs associated with meeting case agents.  CHS-1 was providing assistance with the hopes of receiving favorable consideration for approximately two state level criminal matters of Grand Theft; however, on February 16, 2017, CHS-1 was arrested in North Carolina for Theft after he/she had agreed to work on this investigation.  As a result, the EOCTF declined to provide a letter of recommendation in support of his state matters.

involved in a number of criminal activities with an Armenian
individual (hereinafter, referred to as "CHS-2"), including drug
trafficking, car theft, and fraud.[2]  CHS-1 also discussed
BALIAN's role in those crimes.  Specifically, CHS-1 stated that
in 2015, CHS-1 stole over a dozen high-value cars for CHS-2 and
BALIAN.  CHS-1 explained that after stealing a car, CHS-1 would
leave the keys inside the car and park it on a street designated
by CHS-2, where an unknown co-conspirator would pick up the car.
CHS-2 would then pay CHS-1.  CHS-1 stated that he believed the
cars he/she stole were later loaded into shipping containers to
be sold outside the United States.

    10.    According to CHS-1, before stealing a car, CHS-1
would meet with CHS-2 and BALIAN to discuss which cars to steal
and CHS-1's payment.  CHS-1 recalled that he would use narcotics
with CHS-2 in the presence of BALIAN at these meetings.  After

_____

    [2] CHS-2 was not cooperating with law enforcement at the time
of the conduct described by CHS-1.  After the interview of CHS-
1, the EOCTF investigated CHS-2, obtained authorization to
intercept his telephone calls, and eventually charged CHS-2 with
conspiracy to distribute narcotics and being a felon in
possession of a large number of firearms.  After indictment,
CHS-2 agreed to cooperate with law enforcement.  CHS-2 has a
criminal history record that includes the following convictions:
June 08, 2001, Under the Influence of Controlled Substance
(PCP); November 19, 2001, Possession of a Controlled Substance;
August 17, 2004, Possessing a Forged Driver's License; September
17, 2004, Forgery; December 1, 2010, Possession of a Controlled
Substance for Sale, Transportation/Sell/Etc. of a Controlled
Substance, and Possession of Controlled Substance; June 4, 2014,
Possession of Concentrated Cannabis.  In addition, CHS-2 has an
arrest for a state firearm offense that is currently pending.

deciding which cars to steal, BALIAN would then call an individual he/she knew only as "Cheetah" for approval.[3]

11.   CHS-1 recalled that BALIAN, whom he knew as "Saro,"[4] was present at meetings with CHS-1 and CHS-2 approximately 10 to 15 times in 2015.   CHS-1 occasionally saw BALIAN wearing a law enforcement badge and gun on his hip; however, CHS-1 could not determine which law enforcement agency was listed on BALIAN's badge.   CHS-1 explained that because BALIAN spoke openly about crimes and was present when CHS-1 and CHS-2 used narcotics, CHS-1 believed that CHS-2 trusted BALIAN.   Therefore, CHS-1 was not concerned that BALIAN was a law enforcement officer.

12.   CHS-1 recalled that other individuals would often be present in the office while CHS-1, CHS-2, and BALIAN discussed the theft of cars.   CHS-1 recalled that, on occasion, an individual CHS-1 knew as both "Pete" and "Malo" was present. CHS-1 identified "Pete" as Mexican Mafia associate P.C., when shown a photograph of P.C.[5] From my training, experience, and conversations with other law enforcement officers, I know that the presence of a Mexican Mafia associate during the discussion

---

[3] Based on my knowledge of this investigation, I believe "Cheetah" may be L.T., aka "Lion"; however, CHS-1 has never met "Cheetah."   For this reason, we have not shown CHS-1 a photograph of L.T.

[4] According to GPD personnel records, "Saro" is BALIAN's middle name.

[5] On June 13, 2013, P.C. pled guilty to RICO in United States v. Rudy Aguirre, et al., CR No. 09-939-GW in the Central District of California, and was ultimately sentenced to 15 months' imprisonment.   P.C. was shot and killed outside his home on November 22, 2015, and was believed to be a Mexican Mafia associate at the time of his death.

of criminal activities is a significant indicator that those
actions have been sanctioned by the Mexican Mafia.

13.  CHS-1 also recalled a number of different
conversations with CHS-2 about committing additional crimes to
obtain money.  In one conversation, CHS-2 discussed extorting
marijuana dispensaries in Los Angeles for $50,000.  CHS-1 told
CHS-2 that he/she believed that $50,000 was too much money, and
they agreed to lower it to $2,000 per week depending on the size
of the business.  CHS-2 wanted CHS-1 to go with P.C. and some
"Southsiders" to attempt to extort the dispensaries.  Based on
my training and experience, I understand the term "Southsiders"
is commonly used to refer to Hispanic gang members who pay
tribute to, and take orders from, the Mexican Mafia.  According
to CHS-1, CHS-2's plan was to use the "Southsiders" to
intimidate the dispensary owners and, if that tactic was
unsuccessful, CHS-2 would then send BALIAN and the police to
"hit" the dispensaries.  CHS-1 stated he did not know if CHS-2
actually followed through with this plan.

14.  According to CHS-1, CHS-2 referred to BALIAN as his
partner, and said that BALIAN used a "burner" cell phone to call
Armenian criminals prior to the execution of police search
warrants.  Based on my training and experience, I know that the
term "burner" is used to refer to pre-paid cellular phones that
do not require photo identification to register and are often
used by criminals to remain anonymous and conceal their criminal
activities.

15. I showed CHS-1 a series of photographs and asked if he/she recognized "Saro." Without hesitation, CHS-1 picked the photograph of BALIAN. CHS-1 also recalled that BALIAN drove a four-door Honda Accord, dark grey in color. TFO Antonio Cabrera later informed me that BALIAN's unmarked police car was a dark colored four-door Honda Accord.

16. In late December 2015, I discussed the investigation of CHS-2 and his/her criminal organization with the DEA, including SA Christopher Amidan. Based on my conversations with the DEA, I learned the following:

a. On October 22, 2015, the DEA conducted a trash search of CHS-2's residence. During the search, agents found two pages of handwritten notes. I have reviewed a photograph of one of the handwritten notes that the agents obtained, which appeared to contain criminal objectives. Specifically, the note contained the following: "The [CHS-2] Group, 4th Quarter Goals. 1. Talk to Saro, make the deal P/O Gordo, Mexca 10/per week, at 23.5." Based on my training, experience, and knowledge of this investigation, I believe that the note refers to a price of $23,500 for a kilogram of cocaine from Mexico. While the note suggests that BALIAN, aka "Saro," would be involved in the cocaine transaction, BALIAN's exact role is unknown.

b. On December 11, 2015, the DEA was able to enter and observe an office leased to CHS-2 in Los Angeles, California, after CHS-2 was evicted. I have reviewed photographs of the inside of the office taken by the DEA on December 11, 2015. In one of the photographs, there was graffiti on a wall inside the

9

office that read: "HYRUM, BIG MALO, [CHS-2], ANTO, SARO" and further identified these individuals as a group called the "The [CHS-2] Group," "TNG1," and "Downtown Crew."  This street-gang style writing appeared to identify the organization's name as "The [CHS-2] Group" and listed the monikers of the individuals involved, including P.C. (known as "Big Malo") and "Saro," believed to be John Saro BALIAN.

    B.    Telephone Toll Analysis

    17.    I have reviewed telephone records pertaining to 714-493-8143 (subscribed to "John Balian" at the SUBJECT PREMISES, hereinafter "Balian's Personal Cell Phone") and CHS-2's cell phone (hereinafter, "CHS-2's Cell Phone").[6]

    18.    The records show that between September 1, 2015 and July 22, 2016, CHS-2's Cell Phone and Balian's Personal Cell Phone had approximately 265 communications.  Additional records showed that between December 8, 2016 and March 20, 2017, CHS-2's Cell Phone and Balian's Personal Cell Phone had an additional 11 communications, with the last call on February 25, 2017.

    C.    First Interview of BALIAN by LAPD and FBI

    19.    On April 20, 2017, FBI SA James Muha, and LAPD, Robbery-Homicide Division ("RHD") Detectives Frank Flores and Daniel Jenks interviewed BALIAN.  This interview was recorded. I listened to the recording and learned that during the interview, BALIAN was shown photographs of various people.

_____

    [6] As previously mentioned, we obtained authorization to intercept CHS-2's Cell Phone and confirmed that he was the primary user of the phone.

BALIAN identified the photo belonging to Jose Loza, aka "Santa Fe," aka "Cartune," aka "Pumpkin" ("Loza").[7] BALIAN stated that he knew of Loza from his former duties as a Montebello Police Department Officer. Specifically, BALIAN said, "I was an expert of the Mexican Mafia back at Montebello [Police Department] so I used [to] stay on top of all these guys and stuff like that." BALIAN continued to answer that Loza's name was "Joey, Joey, Joe, Jose, something like that from Canta Ranas." During the interview, BALIAN's answers suggested that he had never met or spoken to Loza. Specifically, at one point, BALIAN stated that he did not have any "run-ins" with Loza, but knew of him only from "intel" from when he worked at the Montebello Police Department.

20. Based on my experience, training, and knowledge of this investigation, I believe that BALIAN was not honest and forthright during the interview and was attempting to hide and conceal his relationship with Loza by providing misleading statements. As described in paragraphs 87-92 below, I believe that BALIAN was communicating with Loza via a burner cell phone to discuss jointly undertaken criminal activities. As also described below in paragraph 64, CHS-3 stated that BALIAN

---

[7] On June 14, 2016, Jose Loza, aka "Cartune," aka "Pumpkin," and 30 members and associates of a Santa Fe Springs-based street gang called "Canta Ranas" were arrested pursuant to a federal indictment for violations of RICO and other crimes in United States v. Jose Loza, et al., CR No. 16-390-VAP. HSI SA Aaron Gutierrez informed me that they believe Loza had recently become a full-fledged member of the Mexican Mafia, is the "shotcaller" of the Canta Ranas gang, and was previously arrested on May 23, 2016, for the murder of another gang member.

provided Loza with information related to extortions and other criminal activity.

21.  When asked about CHS-2 during the interview, BALIAN said that he knows CHS-2 and has been to his office in Los Angeles.  BALIAN said that when he would visit CHS-2 at his office, he noticed a number of individuals hanging out there. BALIAN believed CHS-2 would tell those individuals that CHS-2 had "got this special f**king cop, pig this and that so these guys get all f**king excited, you know which there is nothing like that, absolutely nothing."  BALIAN also said, "I'm not f**king on anybody's payroll."

22.  Upon reviewing the recording and other evidence obtained during the course of this investigation, it is my belief that BALIAN was not forthright and honest pertaining to his criminal activities with CHS-2.  As described in paragraphs 24-27, and 32-33, I believe that, at a minimum, CHS-2 paid BALIAN money in exchange for BALIAN to locate an individual who stole property from CHS-2.

**D.   Arrest and Interview of CHS-2**

23.  In May 2017, TFO Cabrera and I arrested CHS-2 pursuant to a criminal complaint for narcotics distribution, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Possession with intent to distribute and distribution of a controlled substance).

24.  Later that same day, TFO Cabrera and I interviewed CHS-2.  This interview was recorded.  Prior to the interview starting, TFO Cabrera and I identified ourselves to CHS-2 as federal agents and advised him of his rights.  CHS-2 stated he

understood his rights, waived them, and decided to answer our questions without a lawyer present. During the interview, CHS-2 was asked about his relationship with BALIAN and if CHS-2 ever paid BALIAN money. CHS-2 said he has known BALIAN since approximately middle school and has paid him money over the years. CHS-2 described BALIAN as a greedy person who would do anything, including picking up or delivering drugs.

25. CHS-2 provided an example. CHS-2 said that someone broke into his office in February 2017 and stole a significant amount of property. CHS-2 said BALIAN agreed to locate the individual suspected of stealing the property in exchange for $10,000. CHS-2 said that he paid BALIAN $2,000 initially to find the individual responsible and return what was stolen, but BALIAN never recovered/returned any of CHS-2's property. According to CHS-2, after BALIAN failed to locate and recover the stolen items, CHS-2 asked BALIAN to return the $2,000; however, BALIAN had not done so at the time of the interview.[8]

26. CHS-2 recalled another instance in which he paid BALIAN to locate someone. CHS-2 stated that he was contacted by the family of an individual he knew as "Gordo." CHS-2 said that "Gordo" was convicted after a criminal trial in the State of California Superior Court and was serving a life sentence, but

---

[8] As described in paragraph 51 below, we subsequently obtained a search warrant for CHS-2's Cell Phone and found text messages between CHS-2's Cell Phone and Balian's Personal Cell Phone discussing the payment of money in exchange for locating an individual who stole property from CHS-2.

was working on an appeal to overturn his conviction.[9]  According to CHS-2, "Gordo's" family paid him $80,000 to locate a witness named "Patlan" and persuade "Patlan" to recant his/her testimony against "Gordo."  CHS-2 said that "they" reached out to a Mexican Mafia member and that "BALIAN orchestrated this whole f**king thing."  CHS-2 said that BALIAN was unable to locate "Patlan," and CHS-2 returned the $80,000 to "Gordo's" family.

27.  CHS-2 also said that he loaned BALIAN $20,000, which BALIAN never returned; however, CHS-2 terminated the interview before TFO Cabrera and I could obtain more detailed information about the loan.

**E.   Second Interview of CHS-2**

28.  Later in May 2017, TFO Cabrera and I interviewed CHS-2 again.  This interview was recorded and conducted in the presence of CHS-2's attorney.  TFO Cabrera and I asked CHS-2 to provide more specific information pertaining to his relationship and dealings with BALIAN, as well as to provide additional information pertaining "Gordo."

---

[9] It is believed that the "Gordo" mentioned by CHS-2 is Arutyun Khrayan, aka "Gordo" ("Khrayan").  On June 18, 2003, Khrayan was arrested by Glendale Police Department for a failed kidnapping attempt of a wealthy Armenian named A.M., the owner of a baking company in Glendale.  At the time of Khrayan's arrest, Khrayan was traveling in a vehicle with L.T.  Along with Khrayan, L.T. was arrested for assault with a firearm against a Law Enforcement Officer.  L.T. was acquitted at trial.  On January 23, 2008, Khrayan was convicted by a jury in Los Angeles Superior Court, for Kidnapping for Ransom, and other State of California Charges.  James Anthony Patlan testified at trial against Khrayan.  Khrayan was subsequently sentenced to life with the possibility of parole.  On or about April 12, 2012, Khrayan filed an appeal of his conviction with the Court of Appeal, State of California.

29.    According to CHS-2, approximately three years ago, BALIAN told CHS-2 that BALIAN had two Armenian friends -- L.T. and "Coco" (believed to be G.T. ) -- who had a friend named "Gordo" who was incarcerated.  BALIAN stated that "Gordo" was convicted after a gang member named "Patlan" testified against "Gordo."  BALIAN asked CHS-2 if P.C., or some of P.C.'s friends, could find "Patlan" and "bring him in."  BALIAN wanted P.C. and his associates to persuade Patlan to change his testimony.  CHS-2 said it was possible and eventually introduced BALIAN to P.C. in CHS-2's office.

30.    CHS-2 said that after BALIAN met P.C., BALIAN provided CHS-2 with $80,000 as payment to find "Patlan."  BALIAN told CHS-2 that the money originated from "Gordo's" brother.  CHS-2 understood that once "Patlan" was found and changed his testimony, CHS-2 would receive an additional $40,000.  CHS-2 said that out of the initial $80,000, he kept $40,000 and gave $40,000 to P.C.  CHS-2 said that when P.C. was unable to locate Patlan, CHS-2 returned the $80,000 to BALIAN, and took a $40,000 loss because P.C. did not return his share.

31.    CHS-2 said that approximately two years ago, BALIAN asked him for a $20,000 loan to help relocate BALIAN's girlfriend (believed to be S.S.) who was being harassed.  CHS-2 said that he gave BALIAN the money; however, BALIAN never repaid CHS-2.

32.    CHS-2 also discussed again the burglary of his office. CHS-2 said in approximately February 2017, someone broke into his office and stole property.  CHS-2 believed that that an

15

individual named "Sako," who CHS-2 believed was addicted to methamphetamine, broke into his office with the assistance of "Arman Berberyan." CHS-2 believed that Berberyan gave "Sako" an office key, which was used to make entry into the office for the purpose of stealing the property. According to CHS-2, CHS-2 paid BALIAN $2,000 upfront to retrieve the property, and agreed to pay BALIAN an additional $8,000 after BALIAN recovered the property. CHS-2 said that he provided BALIAN with an address on "Denny Street," and that BALIAN requested additional information at some point.[10]

### F.   Interview of U.S. Marshals Service Deputy Rick Shaw

33.   On June 7, 2017, TFO Cabrera interviewed United States Marshals Service ("USMS") Deputy Marshal Rick Shaw at GPD. During the interview, TFO Cabrera asked Deputy Shaw if he had any dealings with BALIAN. Deputy Shaw said in early March 2017, BALIAN came and spoke to Deputy Shaw at his place of work, the USMS Fugitive Task Force at GPD.[11] BALIAN asked Deputy Shaw if he could assist him with locating a subject in one of his investigations named "Armen Berberyan." BALIAN said he had a phone number belonging to the subject, which he obtained from a

---

[10] As described in paragraph 51 below, I obtained a search warrant for CHS-2's Cell Phone and found text messages between CHS-2's Cell Phone and Balian's Personal Cell Phone in which they discuss BALIAN locating individuals named "Berberyan" and "Sako," in exchange for money.

[11] In addition to the USMS task force being stationed at the GPD, I received a letter from Glendale's Interim Chief of Police that stated that over the last several years the City of Glendale has annually received benefits in excess of $10,000 in federally funded programs.

CHS.  BALIAN also identified the CHS by CHS-2's true name.[12]
Deputy Shaw could not remember the phone number BALIAN provided
for Berberyan, but believed it started with 747.[13]  Deputy Shaw
said he conducted a check on the phone number, and learned that
the phone number was being serviced by an internet provider.
Deputy Shaw then asked BALIAN for additional information
pertaining to his CHS because he (Deputy Shaw) needed to write a
search warrant to obtain additional information, such as the
Internet Protocol ("IP") address/location associated with the
phone.  BALIAN told Deputy Shaw that he did not want to disclose
information pertaining to the CHS in any court documents.
Deputy Shaw advised BALIAN he did not need identifier
information pertaining to his CHS, but rather he only needed
BALIAN's statement and reporting information on how BALIAN
obtained Berberyan's phone number from the CHS.  According to
Deputy Shaw, BALIAN declined to provide additional information
for the search warrant affidavit.

     **G.   Second Interview of BALIAN by FBI and DHS**

     34.  On June 21, 2017, FBI SA Brian Adkins and Department
of Homeland Security, Office of the Inspector General (DHS-OIG)
SA Leonard V'Dovec interviewed BALIAN at GPD.  This interview
was recorded and I have listened to the recording.  At the
beginning of the interview, the agents fully identified

---

[12] On March 30, 2018, I spoke to BALIAN's supervisor, GPD
Lieutenant Bob Zahreddine, who informed me that CHS-2 was never
registered as a confidential informant with GPD.

[13] During the search of CHS-2's Cell Phone, we found
telephone number (747)224-8447 saved in CHS-2's Cell Phone
contacts as "Armen 1."

themselves to BALIAN.   During the interview, the agents asked BALIAN, "did anyone ever offer you money" to conduct any law enforcement checks, and BALIAN said "no," and that he never conducted any such checks.   The agents also asked BALIAN if he ever "ask[ed] someone," i.e., another law enforcement officer, to conduct law enforcement checks on anyone in exchange for money.   BALIAN said "no."   BALIAN stated that he knew it was wrong for him to use his position in law enforcement to conduct checks or locate people in exchange for money.

35.   BALIAN also said he knows that CHS-2 is a convicted felon, but the only time he was aware of CHS-2 possessing firearms is when CHS-2 was "stopped in Ventura County."

36.   Based on my experience, training, and knowledge of this investigation, I believe that BALIAN was not honest and forthright during the interview.   As previously described in paragraph 25, during the interviews of CHS-2, CHS-2 specifically said that he paid BALIAN to locate Berberyan and Sako who stole property from CHS-2.   In paragraph 33, Deputy Rick Shaw said that BALIAN came to him and requested his assistance locating Berberyan.   Further, as described in paragraph 51 below, I reviewed text messages between CHS-2's Cell Phone and Balian's Personal Cell Phone discussing BALIAN's attempts to locate Berberyan in exchange for money.   And finally, as discussed in paragraphs 43 and 59, BALIAN later admitted that he has seen firearms in CHS-2's office.

37.   The agents also asked BALIAN if he had any information related to the murder of H.K., and BALIAN failed to provide any

further information.  As discussed in paragraph 56, BALIAN later admitted that he had additional information related to the murder of H.K.  Specifically, during the October 10, 2017 interview, BALIAN told me that Hispanic gang members asked CHS-2 to murder H.K. as retribution for the murder of P.C.

**H.    Third Interview of BALIAN by HSI and FBI**

38.   On August 30, 2017, TFO Cabrera and I interviewed BALIAN at the HSI Long Beach Office.  This interview was recorded.  During the beginning of the interview, TFO Cabrera and I introduced ourselves and told BALIAN that we were federal agents assigned to EOCTF.  I explained to BALIAN that TFO Cabrera and I were the case agents assigned to the prosecution of CHS-2.  I also told BALIAN that we interviewed CHS-2 at length and had questions for him (BALIAN) pertaining to his relationship with CHS-2.  I told BALIAN that when TFO Cabrera and I spoke to CHS-2, we explained to CHS-2 that it was a crime to lie to federal law enforcement, and we only wanted truthful responses to our questions.

39.   During the interview, we asked BALIAN if he "ever received money from [CHS-2]."  BALIAN said "no," but several minutes later said that CHS-2 may have offered him $10,000 or $20,000, but he never received any money from CHS-2.

40.   I then asked BALIAN if he ever provided CHS-2 with "any investigative assistance," and BALIAN said "no" but clarified that CHS-2 came to him about Berberyan.  BALIAN explained that CHS-2 had a falling out with his "crime partner" Berberyan.  According to BALIAN, CHS-2 told BALIAN that

19

Berberyan was wanted by the U.S. Marshals Service.  BALIAN said
he went to the Marshals Task Force at GPD and spoke a U.S.
Marshals Service Deputy.  BALIAN said he told the Deputy
Marshal, "Hey, [CHS-2] provided me a . . . current cell phone of
Armen and apparently you guys went to his girlfriend's house or
wife's house or whatever looking for him?  Here's the cell phone
number.  Maybe you can ping the phone and grab him."

41.  BALIAN also said that he received a text out of the
blue from CHS-2 that said that BALIAN owed CHS-2 $2,000.  BALIAN
said he did not know what CHS-2 was referring to when he
mentioned the $2,000.

42.  BALIAN then described how he believed CHS-2 would make
unrealistic requests from BALIAN and provided an example.
BALIAN said that CHS-2 would say, "'this guy owes me a hundred
thousand.  Can you go and arrest him?  Take him to a room and I
walk in.  Let me slap the s**t out of him and get my money out.
I'll give you ten percent.'"

43.  I asked BALIAN if when he observed CHS-2 use heroin
when BALIAN visited CHS-2 at his office.  BALIAN acknowledged
that he had, and said that CHS-2 would tell BALIAN, "hey, I have
to do it or I'm going to get sick.  Out of respect for you, I'm
going to go in the back and do it."  I then asked BALIAN if he
ever saw weapons inside CHS-2's office during his visits.
BALIAN acknowledged that he had and said, "[a] couple times when

he opened up the safe, I just . . . kind of looked and I saw like the butt of a handgun.  Stuff like that.  And that's it."[14]

44.  I asked BALIAN if he and CHS-2 ever discussed doing crimes together.  BALIAN acknowledged that CHS-2 told BALIAN that CHS-2 could provide BALIAN with locations of drug stash houses and CHS-2 suggested that they steal the drugs together.

45.  I asked BALIAN if he was aware that CHS-2 had a relationship with the Mexican Mafia and other Hispanic gangs. BALIAN acknowledged that CHS-2 did have a connection and said that he met P.C. through CHS-2 during one of his visits to CHS-2's office.  BALIAN said that despite meeting P.C., he did not maintain a friendship or relationship with P.C.  When BALIAN would visit CHS-2 at this office, he noticed P.C. was there on two or three occasions.  BALIAN said when he arrived, P.C. would leave.

46.  BALIAN also described one visit with CHS-2 in which CHS-2 showed BALIAN a picture that was on CHS-2's cell phone. According to BALIAN, the picture was of P.C. and two other Hispanic males that BALIAN suspected were gang members that was taken in Las Vegas.  CHS-2 told BALIAN that one of the individuals was a gang member from "Frogtown" and the other was from a gang in Santa Fe Springs.

47.  TFO Cabrera asked BALIAN if he knows an individual known as "Santa Fe."  BALIAN responded, "Yeah, I . . . know of

---

[14] CHS-2 has three prior felony convictions, the first of which occurred in 2001, and is prohibited from possessing firearms.

him.  Yeah.  Cartune."[15]  TFO Cabrera then inquired about the gang member from "Frogtown."  BALIAN responded, "Yeah . . . Bouncer from Frogtown."[16]  TFO Cabrera asked BALIAN, "have you ever met Santa Fe," and BALIAN responded, "No."  TFO Cabrera then asked, "Have you ever seen [Santa Fe] at [CHS-2's] office," and BALIAN again responded, "No. Never."  BALIAN said that CHS-2 wanted BALIAN to sit down and meet with "Cartune" and "Bouncer" in his office, but BALIAN said that he refused to do so.

48.  BALIAN was asked again if he had ever met "Cartune" or "Bouncer" in person, and BALIAN responded, "no."  BALIAN was then asked if he knows CHS-3 by his gang moniker,[17] and BALIAN responded "no."

49.  TFO Cabrera asked BALIAN again, if he had ever met any "EME [Mexican Mafia] guys," and BALIAN said "no."  TFO Cabrera also asked BALIAN again if he had ever met "Cartune," and BALIAN said, "No."

50.  Upon reviewing the evidence obtained during the course of this investigation, it is my belief that BALIAN did not answer questions truthfully in this interview.  As was explained in detail in paragraphs 24-27, and 32-33, BALIAN was not truthful about receiving money from CHS-2 for the specific

---

[15] Based on my investigation, I believe BALIAN was referring to Jose Loza, aka "Cartune," aka "Pumpkin," who is the lead defendant in United States v. Jose Loza, et al., CR No. 16-390-VAP; a RICO case targeting the Canta Ranas gang, and others.

[16] Based on my investigation, I believe BALIAN is referring to Jorge Grey, aka "Bouncer," who is the lead defendant in United States v. Jorge Grey, et al., CR No. 15-334-PSG; a RICO case targeting the Frogtown gang, and others.

[17] CHS-3 is a Hispanic gang member discussed more fully below.

purpose of finding Berberyan.  Moreover, BALIAN was not truthful about knowing and maintaining a relationship with several Hispanic gang members.  As described below in paragraphs 64-96, BALIAN not only knew Hispanic gang members (Loza and CHS-3, and others), but BALIAN texted them, provided them pre-paid cellular phones, and met with them in person.

### I.    Search Warrant and Review of CHS-2's Cell Phone

51.  On July 27, 2017, I obtained a Federal Search and Seizure warrant from the Honorable Andrew J. Wistrich, United States Magistrate Judge, Central District of California, for CHS-2's Cell Phone.  From my review of the contents of the phone, I found text messages between CHS-2's Cell Phone and Balian's Personal Cell Phone regarding a burglary of CHS-2's business.  Of note, the text messages describe how CHS-2 paid BALIAN $2,000 and promised another $8,000 when BALIAN found "Berberyan" and returned CHS-2's property.  Enclosed are the excerpts of some of the pertinent texts between CHS-2's Cell Phone and Balian's Personal Cell Phone:

| Date: | From Phone#: | Message: |
|-------|--------------|----------|
| 2/03/2017 | CHS-2 | Call me |
| 2/03/2017 | CHS-2 | 10,000 to start for you |
| 2/04/2017 | BALIAN | Call me |
| 2/04/2017 | CHS-2 | We came in, we have a whole thing of tape coming in and walking out. Like Santa Claus everything in his hands |
| 2/04/2017 | BALIAN | When are you going to be alone? |
| 2/04/2017 | CHS-2 | Right now if you need me to be |
| 2/04/2017 | BALIAN | Not now, how about in a few hours? |
| 2/04/2017 | CHS-2 | Done my Ace done |
| 2/04/2017 | BALIAN | Ok |

| 2/04/2017 | BALIAN | On my way |
|---|---|---|
| 2/04/2017 | BALIAN | Ok if big b comes? |
| 2/04/2017 | BALIAN | Here |
| 2/04/2017 | CHS-2 | Sako was the name of the perpetrator Sakoh get armen,Sakoh bring them to me |
| 2/06/2017 | CHS-2 | I'm home have $$ call you when free |
| 2/06/2017 | BALIAN | Ok |
| 2/06/2017 | CHS-2 | I'm going to go ahead and take you up on that you just please brother This is all that was a gift to my son and I did just like my dad I'm losing it so I ask you be my friend as much as you are a professional |
| 2/07/2017 | CHS-2 | Sorry brother come to my office early morning tomorrow please come early bro please early I can't let this go any longer please come early |
| 2/07/2017 | CHS-2 | Are you in town Im going to my office now |
| 2/07/2017 | BALIAN | No bro |
| 2/07/2017 | CHS-2 | I just found out Sakoh is a photographer this for you to know |
| 2/07/2017 | BALIAN | Ok |
| 2/07/2017 | CHS-2 | I'll be in the office around four |
| 2/07/2017 | BALIAN | Ok |
| 2/08/2017 | BALIAN | Bro, what happened last night? I waited for you all night |
| 2/08/2017 | CHS-2 | I'm on my way to office right now come see me important |
| 2/08/2017 | BALIAN | I can't right now I'm working |
| 2/08/2017 | CHS-2 | OK when you're off work I'll be there all night |
| 2/08/2017 | BALIAN | How old is Armen? |
| 2/08/2017 | BALIAN | Also what's his height and weight |
| 2/08/2017 | CHS-2 | Mid or late 30s 511 6 feet Maybe 180 to 200 pounds |
| 2/08/2017 | BALIAN | Ok |
| 2/08/2017 | BALIAN | You don't have pic of him? |
| 2/09/2017 | CHS-2 | I don't have a picture |
| 2/09/2017 | CHS-2 | Brother I don't want to lose my stuff |
| 2/09/2017 | BALIAN | Bro, I work full time. I am on it and working on it also. There's only so much I can do. These guys hide well and I'm doing this only with what you said and I know your word is good. I don't want you to think I'm sitting here not doing anything. If you here any new info or think of another angle let me know. |
| 2/09/2017 | CHS-2 | My brother if you can come to the office tomorrow I'll stay late for you we will get this done together and you get stackstill tomorrow I |

| | | |
|---|---|---|
| | | appreciate your help just knowing I have you there bro does the world for me |
| 2/09/2017 | BALIAN | Brother, please give me a solid time and let's try to keep it. It's hard for me to drop everything and come to the office unless I can pre plan it. Please understand! I will do my best when I see you I'll fill you in! |
| 2/09/2017 | CHS-2 | I got Sako's family's address |
| 2/09/2017 | BALIAN | What is it? |
| 2/09/2017 | BALIAN | Also what do they call Armen on the streets? |
| 2/09/2017 | CHS-2 | It's on Danny St., North Hollywood I can give you the street address when I swing by |
| 2/09/2017 | BALIAN | I need the exact address! |
| 2/09/2017 | BALIAN | Also what do they call Armen on the streets? |
| 2/09/2017 | BALIAN | I need the address, also what is Aremens moniker? |
| 2/09/2017 | CHS-2 | OK my brother I'm going to the house right now I'll text you the address |
| 2/09/2017 | BALIAN | Ok, I need to know Armen's moniker? |
| 2/09/2017 | CHS-2 | 6323 Danny St This is Sakoh's parents house |
| 2/09/2017 | CHS-2 | Regarding Moniker I I'm working on it |
| 2/09/2017 | BALIAN | Can he be from AP? |
| 2/09/2017 | BALIAN | Do you have a cell phone number for Armen? |
| 2/10/2017 | CHS-2 | He's here |
| 2/10/2017 | BALIAN | Who? |
| 2/10/2017 | CHS-2 | Armen |
| 2/10/2017 | BALIAN | Did you get your stuff? |
| 2/10/2017 | BALIAN | Get his cell number for later |
| 2/10/2017 | BALIAN | What's he saying? He doesn't have it? |
| 2/11/2017 | CHS-2 | 13233665030 |
| 2/11/2017 | BALIAN | Where's your stuff? |
| 2/11/2017 | CHS-2 | By Sako |
| 2/11/2017 | CHS-2 | Focus on Sakoh hundred percent all resources on |
| 2/11/2017 | BALIAN | How did Sako get the key? |
| 2/11/2017 | BALIAN | He is lying to you brother |
| 2/11/2017 | BALIAN | Why can't he help you get from Sako since he is the one that sent him |
| 2/11/2017 | BALIAN | Armen is responsible |
| 2/11/2017 | CHS-2 | I'm is number 323-3665030 ArmenCH's number |
| 2/12/2017 | CHS-2 | Freaking phone left on sisters car I have no former freaking disaster i feel like everything Is falling apart on me this guy is a mess my life up. Brother I know what your prices and I will minute I want to file charges against both of them I'm in Sako and Armen. |

| 2/12/2017 | CHS-2 | I want to press charges against Sakoh and Armen, and file a civil suit against ArmenCH family,whatever you've told me I'm ready |
|---|---|---|
| 2/14/2017 | CHS-2 | But I want to make a seal on the news everything man I'll be home and I'm sure I want to press charges |
| 2/15/2017 | CHS-2 | Bro what happened you........now I I am alone. |
| 2/18/2017 | BALIAN | Where you at bro? |
| 2/18/2017 | CHS-2 | Head on over brother I exited home on over |
| 2/18/2017 | BALIAN | Ok, where do you recommend to park? |
| 2/18/2017 | CHS-2 | I would say on Olive brother across secada restaurant,usual place |
| 2/18/2017 | BALIAN | Ok |
| 2/18/2017 | CHS-2 | 818-366-5010 repeat on Armen number |
| 2/18/2017 | CHS-2 | You're right 5030 that is his number 100% |
| 2/18/2017 | BALIAN | Ok good! |
| 2/21/2017 | CHS-2 | All focused on Sakoh I got valid information he's the culprit hundred percent All iFocus attention on him |
| 2/21/2017 | BALIAN | I think they both are involved |
| 3/05/2017 | CHS-2 | *Brother if you can't do anything at least give me 1500 back* |
| 3/05/2017 | BALIAN | *You can have the whole thing back, I don't need it* |
| 3/05/2017 | BALIAN | You are to impatient |
| 3/05/2017 | CHS-2 | Sorry bro I'm want to lose all my stuff |
| 3/05/2017 | BALIAN | *I told you I'm working on things but I'm not a magician. You have to wait, you got your self involved with these guys* |
| 3/05/2017 | BALIAN | He doesn't come out of his house |
| 3/05/2017 | BALIAN | I'm sure Armen is involved also |
| 3/13/2017 | CHS-2 | Bro when can I see you |
| 3/13/2017 | BALIAN | Tomorrow bro |
| 3/13/2017 | CHS-2 | Ok brother |
| 3/17/2017 | CHS-2 | Things are kind of hard bro can I see you tomorrow |
| 3/17/2017 | BALIAN | Yes bro, I'm waiting for you |
| 3/20/2017 | BALIAN | Good morning bro, are you there now? |
| 3/29/2017 | CHS-2 | I just got raded call me back |
| 3/30/2017 | BALIAN | ?? |

### J.   Fourth Interview of BALIAN by HSI and FBI

52.   On October 10, 2017, TFO Cabrera and I interviewed
BALIAN at the Seal Beach Police Department.  This interview was
recorded.  At the beginning of the interview, I explained to
BALIAN that it was a crime to lie to federal agents.
Additionally, I explained to BALIAN that TFO Cabrera and I only
wanted the truth to our questions.  BALIAN said he understood.

53.   I asked BALIAN if he has ever received money from
CHS-2 at any time.  BALIAN responded, "No.  Absolutely not."

54.   I asked BALIAN if CHS-2 ever requested BALIAN to aid
CHS-2 in locating someone.  BALIAN said CHS-2 did ask, but
BALIAN declined to help CHS-2.  BALIAN clarified that he did do
one "check" for CHS-2 related to Berberyan, and "found out the
Marshals were looking for him and . . . passed it on to the
Marshals."

55.   TFO Cabrera asked BALIAN that if CHS-2 ever referred
to BALIAN as "his detective."  BALIAN acknowledged that he was
aware that CHS-2 made such references, but said that when he
would hear those comments, he would instruct those individuals
not to make such comments because people could get the wrong
idea.  BALIAN then told TFO Cabrera, "Looking back, [CHS-2] used
the s**t out of my name and my position.  You know what I mean?
But, I can't go back in time to change anything.  . . . But him
giving me money?  No."

56.   I asked BALIAN if CHS-2 ever discussed with him any
criminal activities.  BALIAN said, "Yes."  BALIAN said that when
he visited CHS-2 at his office, CHS-2 discussed with BALIAN

killing H.K.  According to BALIAN, CHS-2 told BALIAN that CHS-2 received a call from members of the Mexican Mafia directing CHS-2 to kill H.K. because they believed H.K. killed P.C.

57.  I again asked BALIAN if he saw any men in CHS-2's office when BALIAN visited.  BALIAN acknowledged that he had seen P.C. in the office three or four times.

58.  I asked BALIAN what he knew about P.C. at that time. BALIAN said he knew P.C. was previously incarcerated, based upon P.C.'s tattoos.  BALIAN believed P.C. was "connected," based upon what CHS-2 had told him.  BALIAN also said that he believed that P.C.'s uncles were from the Avenues gang.

59.  I asked BALIAN if he had seen any weapons in CHS-2's office and BALIAN said that he had seen the "butt of [a] gun" in CHS-2's safe, and that CHS-2 had previously sent BALIAN a text message with a "picture of a gun" with an accompanying text message that read, "Look what I just got."

60.  I showed BALIAN a black and white six-pack paper photo lineup that contained Loza and asked BALIAN to pick out anyone he recognized.  BALIAN said that number two (Loza) "looks familiar, but I don't know from where."  I asked BALIAN if he remembered meeting the person in the photo or remembered the context of how he recognized him, and BALIAN responded, "No.  I think I saw maybe an article or something.  Or . . . read about him somewhere."

61.  TFO Cabrera then showed BALIAN the same six-pack photo, but in color on TFO Cabrera's iPhone.  BALIAN noticed the file name was "Loza Six Pack" and asked us if the person he

pointed to in the photo was named Loza.   TFO Cabrera

acknowledged that it was Loza, but BALIAN still maintained that

he did not recognize Loza.   Specifically, BALIAN said, "he looks

familiar, but I don't know from where."

62.   I asked BALIAN, "have you ever met a Jose Loza before

. . . or "[CHS-3's moniker]."   BALIAN said "No" to both

individuals.

63.   TFO Cabrera showed a colored photo of CHS-3 to BALIAN

and asked him if he recognized him.   BALIAN looked at the photo

and commented on CHS-3's neck tattoo, but said that he did not

recognize him.

**K.   Interview of CHS-3 by LAPD-RHD**

64.   On October 24, 2017, LAPD-RHD interviewed CHS-3.[18]   The

interview was recorded.   I have listened to the recording and

learned that CHS-3 told the detectives that Loza had a "DEA

agent" who provided Loza with information.   According to CHS-3,

---

[18] In April 2017, CHS-3 was arrested by LAPD-RHD for
extortion.   CHS-3 is a Hispanic male, St. Andrews (STA) gang
member, and a Mexican Mafia associate.   At the time of the
interview, CHS-3 was in county jail pending trial on the
extortion charge.   CHS-3 has prior arrests for Penal Code
Section 594(B)(1) Vandalism, an arrest and misdemeanor
convictions for Penal Code Section 12025(A) Carry a Concealed
Firearm, an arrest for Penal Code Section 69, Obstruct / Resist
Executive Officer, an arrest for Penal Code Section 186.22,
Participate in a Criminal Street Gang, an arrest for Health &
Safety Code Section 11350(A), Possession of a Controlled Substance, an
arrest for Penal Code Section 25850(C), Carrying a Loaded
Handgun, and an arrest and misdemeanor conviction for Vehicle
Code Section 23152(B), Driving While Under the Influence of
Alcohol.   CHS-3 was also indicted in a Federal criminal case for
a violation of 21 U.S.C. § 846, that is currently pending.   I
believe CHS-3 provided information to law enforcement in hopes
of receiving consideration for his pending state and federal
cases.

the DEA agent would provide Loza with information pertaining to locations and individuals the Mexican Mafia should extort. The detectives showed CHS-3 a six-pack photographic line up, which included BALIAN. Without hesitation, CHS-3 identified BALIAN as the DEA Agent that worked for Loza.

65. The detectives asked CHS-3 about his relationship and associations with BALIAN. CHS-3 said he met BALIAN in person approximately one month after Loza was arrested for murder.[19] CHS-3 stated he was aware that BALIAN was working first with P.C., and then with Loza. CHS-3 said that after P.C. was murdered and Loza was arrested, "The cop came looking for me."

66. CHS-3 stated that he was at Compadres Restaurant when someone told him that someone was looking for him. CHS-3 stated:

> I already knew about him. I had been with Cartune (Loza) and Trigger when they were talking to him,[20] but he didn't want to meet or see anyone else at that time. Then Trigger got busted. At that time I was the only one out there. There were no other avenues, so he came looking for me. I was the only one out there on the street that he could trust. He comes to me with a list. Go pick up this money. Do this or that. Take care of these Armenian people. Cartune says do this or that. Go hit these Armenian people. That's all the s**t I had to do.

67. CHS-3 told the detectives that BALIAN told P.C. the FBI was coming to arrest "Bouncer" (Grey) the next day.

---

[19] From my investigation, I know that Loza was arrested for Murder on May 23, 2016.

[20] CHS-3 identified "Trigger" as J.M. from the King Kobras Street Gang. J.M. was arrested on August 16, 2016, and is currently in Los Angeles County Jail, pending trial for a violation of California Penal Code Section 187(A), Murder.

According to CHS-3, P.C. relayed this information to "Bouncer," which resulted in "Bouncer" fleeing.[21]  CHS-3 explained that BALIAN had called P.C. and said, "Tell your boy Bouncer that he's the number 1 on the list for tomorrow."

68.  CHS-3 said that CHS-3 and BALIAN made arrangements to communicate via pre-paid cellular phones, which CHS-3 referred to as "Burners."  CHS-3 explained that the "Burners" were only to be used to communicate with each other, and for no more than one month at a time.

69.  LAPD Detectives obtained CHS-3's phone from the evidence vault, and CHS-3 provided the passcode to unlock the phone to the detectives.  CHS-3 said BALIAN was listed in the contacts as "Bro."  LAPD detectives reviewed the phone and found an entry for "Bro" with an associated cellular number of (562)991-8178 (hereinafter, "Balian's Burner Phone").

70.  LAPD Detectives found a text message conversation between CHS-3 and Balian's Burner Phone.  In the message, CHS-3 said "hi bro", and Balian's Burner Phone responded, "Bro Ill be in Pico."  CHS-3 responded and said, "Ok how your dad bro." Based on my investigation, I am aware that BALIAN's father was being treated for cancer.

71.  CHS-3 told the detectives that he regularly met in person with BALIAN and they changed burner phones about once a month.  Due to security concerns, CHS-3 said he and BALIAN would

---

[21] As previously discussed, "Bouncer" (grey) is the lead defendant in United States v. Jorge Grey, et al., CR No. 15-334-PSG.  I spoke to the case agent in that case and learned that Grey was not home when agents executed their arrest warrants and was a fugitive for more than a month before he was apprehended.

only call each other on the burner phones. CHS-3 said BALIAN
would provide CHS-3 information on locations of marijuana grows
and drug stash houses. CHS-3 said BALIAN would obtain this
information from surveillances BALIAN conducted or information
obtained through his access as a law enforcement officer.
BALIAN would relay to CHS-3 the locations of where BALIAN or GPD
were planning to execute search warrants, and would ask CHS-3 to
"hit them" before law enforcement executed the search warrants.
According to CHS-3, BALIAN would also provide CHS-3 with the
names and locations of people to extort. BALIAN instructed CHS-
3 to "slap around" individuals to persuade them to pay money.
BALIAN also told CHS-3 that Armenians would not respect or pay
CHS-3 if they did not fear CHS-3.

    72. CHS-3 advised that after an individual known as "Pzo"
was arrested, "Pzo" was placed in federal custody at the
Metropolitan Detention Center, Los Angeles.[22] CHS-3 was aware
that Loza was incarcerated at the same facility. According to
CHS-3, it was during this time that Loza successfully extorted
"Pzo" (Kazarian) for $100,000. CHS-3 believed that Loza
extorted Kazarian because BALIAN told Loza that Kazarian was in
Las Vegas "gambling a million dollars."

    73. CHS-3 stated Kazarian paid the $100,000 in two
payments. CHS-3 was not involved in picking up the first
payment of $50,000; however, CHS-3 said he collected the final

---

[22]On July 6, 2017, Armen Kazarian, aka "Pzo," was arrested
by the EOCTF and the USMS for violating his Federal probation
after he left California without court permission. EOCTF
conducted surveillance of Kazarian on February 19-20, 2016, and
observed Kazarian gambling at the Wynn Hotel, Las Vegas, Nevada.

$50,000 payment from an unknown Armenian male at Whole Foods off of the 101 Freeway. CHS-3 said that he delivered the money directly to BALIAN. According to CHS-3, BALIAN instructed CHS-3 to pay other individuals: Mexican Mafia members R.S. and M.T. and an individual known as "Little V." BALIAN then told CHS-3 to keep $5,000 for himself, and BALIAN retained the remaining money. Based on the instructions BALIAN was giving CHS-3, CHS-3 believed BALIAN was in communication with Loza.

74. CHS-3 told the detectives about another extortion that BALIAN instructed him to initiate on behalf of Loza. According to CHS-3, BALIAN directed CHS-3 to go to "[O.K.'s] Auto Body" and just "make up reasons to hit up the guy for money." BALIAN told CHS-3 to tell the owner, "Just say we're mad. Make up s**t. Just hit them up for money." After CHS-3 contacted O.K.'s auto body shop, CHS-3 was told that the owner called BALIAN and asked BALIAN for advice on how to handle the extortion. CHS-3 believes that BALIAN told the owner to pay CHS-3. CHS-3 said that he went back and forth to the business several times dealing with the extortion, and even though "the Armenian guy (at O.K.'s auto body shop) was hiding from me, one of his Mexican workers paid me the money."

75. I have reviewed an LAPD police report made by O.K. regarding an extortion which took place between December 2014 and January 2015. According to the police report, the suspects were described as heavily-tattooed male Hispanics. The victim allowed law enforcement to view his surveillance video and

acknowledged that he paid the suspects,[23] but eventually became uncooperative with the investigating detectives.

76.  CHS-3 also recalled an incident in which BALIAN told CHS-3 about a recent arrest that the GPD made for drug distribution.  According to CHS-3, BALIAN told CHS-3 that the arrest occurred in a parking lot in the city of Pacoima off of Van Nuys Blvd.  BALIAN said that his team recovered pounds of methamphetamine.  CHS-3 said that BALIAN showed CHS-3 pictures and said, "This is where we followed him from.  Go hit it tonight, before my team goes there. . . .  Get a crew and hit it tonight."  CHS-3 stated that he did as instructed, but they did not find anything of value.

77.  LAPD detectives spoke with BALIAN's supervisor, GPD Sergeant Toby Darby, and asked if the Pacoima arrest was familiar to him.  Sergeant Darby immediately recalled the Pacoima arrest described by CHS-3 and stated it was an investigation that BALIAN personally handled.  Sergeant Darby told the LAPD that on January 9, 2017, the GPD narcotics team followed a male Hispanic driving his truck from his residence in Sylmar to a shopping center in Pacoima.  A pound of methamphetamine was subsequently recovered by GPD Narcotics Unit and two arrests were made.

78.  CHS-3 also said that BALIAN asked him to rob an Armenian male (believed to be Armen Berberyan) who stole property from another Armenian male and identified CHS-2's true

_____

[23] In a subsequent interview, CHS-3 identified himself and J.M., aka "Trigger," from a surveillance photograph recovered from O.K.'s auto body shop.

and correct first name as the victim.  According to CHS-3,
BALIAN provided CHS-3 with the location of the residence of the
person who possessed the property; however, CHS-3 did not
provide the LAPD with the address during the interview, although
CHS-3 accurately described the residence.  CHS-3 said that
BALIAN told him to, "Go hit him.  He has all the s**t."

79.  CHS-3 described another incident involving BALIAN.
According to CHS-3, BALIAN offered CHS-3 and J.M. $100,000 to
scare an individual.  CHS-3 said that he was unable to
participate but provided his grey Honda Pilot to J.M.

80.  According to CHS-3, J.M. returned his vehicle after
J.M. attempted to scare the individual, and told CHS-3, "I think
I hit [shot] him."  CHS-3 responded, "I thought you told me that
you were just going to scare him."  CHS-3 said that J.M. left
the gun with CHS-3 but called CHS-3 later that night and said,
"I think I killed him.  [The area is] all blocked off."

81.  CHS-3 believed that J.M. subsequently called BALIAN
for help, because BALIAN and J.M. subsequently drove to CHS-3's
residence, at which time CHS-3 gave the gun to BALIAN.

82.  CHS-3 said that he believed the victim did not die,
and the shooting occurred off the I-5 freeway near a warehouse.
CHS-3 described the victim as an Armenian male, and occurred
approximately one year ago (from the time of his interview with
the LAPD).

83.  LAPD Detectives conducted a review of their systems
and determined that on July 14, 2016, a shooting occurred in the
City of Commerce in the 5300 block of Sheila Street.  The victim
of the shooting, T.N., was a bodyguard and driver for G.T.
Based on my investigation, I know that G.T. is an Armenian male

and the son of L.T.   According to the police report, G.T. and
T.N. had just left G.T.'s business, on Randolph Street, which is
located in the City of Commerce.   The location of the shooting
is between the 710 and 5 Freeways near Washington Boulevard,
which I believe is consistent with CHS-3's description of the
location.   The report describes the suspect's vehicle as a grey
Honda Pilot.

84.   On November 27, 2017, the LAPD obtained a search
warrant from the Honorable Judge Ray G. Jurado of the Los
Angeles County Superior Court, for telecommunication records for
Balian's Personal Cell Phone, which I have subsequently
reviewed.   An analysis of the cell site location data shows that
Balian's Personal Cell Phone used a cell tower approximately two
blocks from CHS-3's residence on July 14, 2016, at 10:37pm.

85.   Following the shooting of T.N., the victim's SUV was
impounded as evidence.   According to the LASD, Detective Nick
Stewart was contacted by Felix Cisneros, who at the time was a
SA with HSI.   Cisneros attempted to have the impound fees
exonerated on behalf of L.T. and G.T.

86.   Cisneros was also suspected of corruption in the form
of assisting foreign nationals with entry into the United States
as a result of an investigation by the FBI, DHS-OIG, and the DHS
– Immigration and Customs Enforcement Office of Professional
Responsibility.[24]   LAPD detectives interviewed Cisneros and
determined that he was a close personal friend of BALIAN.
According to the LAPD, both Cisneros and BALIAN had worked for
G.T. as security.   Cisneros also advised the LAPD that Cisneros

---

[24] Cisneros was eventually indicted in the Central District
of California in CR No. 17-229(A)-CAS, and on April 24, 2018,
Cisneros was convicted by a jury of conspiracy to aid and assist
the entry of an alien convicted of an aggravated felony into the
United States, acting as agent of another person in a matter
affecting the government, falsification of records in a federal
investigation, and making false statements.

had previously received information from BALIAN that victim H.K. was involved in illegal marijuana distribution.

### L.    Review of Loza's Cellphone by HSI-HIDTA

87.    On November 29, 2017, HSI SA Gutierrez searched a cell phone belonging to Loza (hereinafter, "Loza's Cell Phone"), pursuant to a search warrant signed by the Honorable Karen L. Stevenson, United States Magistrate Judge.

88.    During SA Gutierrez's review, he observed an outgoing text message on May 17, 2016, to Balian's Personal Cell Phone. The message stated, "New num 4 santa fe." Based on my training, experience, and knowledge of this investigation, I know that "Santa Fe" is a moniker for Loza, and is believed to refer to him and his gang, Canta Ranas from Santa Fe Springs, California.

89.    On May 20, 2016, Balian's Personal Cell Phone sent a message to Loza's Cell Phone stating, "I'm ready to paint the kitchen." Loza responded and said, "K let me call." SA Gutierrez believes that BALIAN was using coded language ("ready to paint the kitchen") when speaking with Loza and was likely referring to some type of criminal activity.

90.    Between May 21, 2016, and May 23, 2016, Balian's Personal Cell Phone sent multiple text messages requesting to meet with Loza, but Loza was unable to meet at that time.

91.    On May 20, 2016, Balian's Personal Cell Phone sent a text message to Loza's Cell Phone that stated, "P the camarada just gave me pelon's # do you mind if I chop it up with him or do you want me to wait until you get." Loza's Cell Phone responded and said, "Goahead."

92.   SA Gutierrez believes the letter "P" is a reference to Loza because he is commonly referred to as "P" by other Canta Ranas members, likely because one his monikers is "Pumpkin."

**M.   Telephone Analysis of CHS-3 Burner Cell Phone and Balian's Burner Phone**

93.   On November 27, 2017, the LAPD obtained a search warrant from the Honorable Judge Ray G. Jurado of the Los Angeles County Superior Court, for telecommunication records for a cellphone used by CHS-3 (hereinafter, "CHS-3's Burner Phone") and Balian's Burner Phone.

94.   On December 15, 2017, LAPD received the call records from the telecommunications company, which I have subsequently reviewed.  An analysis of the cell site location data from January 2017 to March 2017 showed that Balian's Burner Phone was traveling from Seal Beach, California, to Glendale, California, on a regular basis consistent with BALIAN's regular commute from his home in Seal Beach to his work location at the GPD.  The records also showed 16 calls between Balian's Burner Phone and CHS-3's Burner Phone between March 29, 2017 and April 21, 2017, consistent with CHS-3's proffer statement.

95.   I have examined telecommunication records ranging between January 23, 2017 and November 23, 2017, and learned that Balian's Burner Phone called (xxx)xxx-0999 on two occasions on April 5, 2017.  Telephone number (xxx)xxx-0999 is subscribed to S.S. in Brownsville, Texas.  Based on my investigation, I believe that S.S. is BALIAN's girlfriend.  Specifically, during interviews in this investigation, BALIAN told investigators on

two different occasions that he has a girlfriend named "Sandra." I have also examined border-crossing records that show that BALIAN has crossed the United States-Mexico border with S.S. on multiple occasions.  In addition, toll records show that Balian's Personal Cell Phone called (xxx)xxx-0999 1,534 times between December 29, 2015 and January 5, 2018.[25]

96.  I have reviewed toll records obtained by the LAPD and learned that Balian's Personal Cell Phone called (562)200-6899 on July 15, 2017, the day after the shooting of T.N. and G.T.  CHS-3 identified (562)200-6899 as a cell phone used by "Trigger" (J.M.).  Additional toll records obtained by the LAPD showed that Balian's Burner Phone called (310)407-9063 during the period of January 23, 2017 to March 22, 2017, on 27 occasions.  (310)407-9063 is associated with A.M., who provided the number when she visited J.M. at the Los Angeles County Jail.

### N.    Request for Nighttime Service

97.  I request that the Court authorize investigators to serve the warrant on the SUBJECT PREMISES during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  Good

---

[25] On May 10, 2012, S.S. was referenced in an HSI criminal investigation out of Brownsville, Texas, regarding international money laundering by the Gulf Cartel.  Based on my training and experience, I understand that the Gulf Cartel is a violent Mexican criminal organization involved in large scale drug trafficking and human smuggling.  During the investigation, HSI learned that S.S. had a romantic relationship with the subject of their investigation, a ranking Gulf Cartel member.  On or about February 12, 2013, HSI Brownsville SAs interviewed S.S. During that interview, S.S. confirmed having a romantic relationship with the subject, but claimed that she had no knowledge of the subject's alleged criminal activities.  The HSI investigation was closed without charges being filed against S.S.

cause for nighttime service exists because of the violent nature of the underlying criminal activities of BALIAN and his co-conspirators.  I also believe that because BALIAN is a law enforcement officer, he is likely to be familiar with law enforcement tactics which may allow him to hinder the execution of the search warrant in unforeseen ways, or at a minimum destroy evidence, if he is able to detect the execution of the search warrant.  And, if law enforcement were to execute this warrant during the day time, it would be very difficult to evade detection and would, thus, pose a risk for officer safety. Further, I am aware that the GPD does not issue firearms to its officers, and that BALIAN was required to purchase his own firearm.  Therefore, I believe BALIAN is likely to possess a firearm inside the SUBJECT PREMISES.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

98.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement

41

laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[26] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file

---

[26] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been

responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it been used for, and who has used it, may

be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also

45

contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

99. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the investigation, I know of other factors that may prevent a search of any digital devices at the Subject Premises, including the following: (1) BALIAN's GPD personnel file indicates that he is a certified interpreter in the Armenian language, and at least one other unspecified language; (2) according to J.S., BALIAN frequently purchased new burner cell phones and I believe several burner phones may be found inside the Subject Premises; and (3) BALIAN has attempted to hide or destroy evidence in the past when he disposed of the firearm that was used in the drive-by shooting described in paragraph 81 above.

100. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    <u>CONCLUSION</u>

101. For all the reasons described above, there is probable cause to support an arrest warrant and criminal complaint charging BALIAN with a violation of 18 U.S.C. § 1001, False Statements to Federal Agents, and that evidence, fruits, and instrumentalities of the offenses described in Attachment B will be found at the premises described in Attachments A-1 and A-2.

_____/S/_____
MICHAEL HYLAND
HSI SPECIAL AGENT

Subscribed to and sworn before me
this _14th_ day of May 2018.

ALICIA G. ROSENBERG
_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE