Craig H. Missakian (SBN 125202)
LAW OFFICES OF CRAIG MISSAKIAN
116 Club Road
Pasadena, CA 91105
Telephone: (818) 802-9811
Email: craig@cmlawpartners.com

Attorney for Defendant
John Saro Balian

FILED
CLERK, U.S. DISTRICT COURT

July 16, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_VRV\_\_\_\_ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>John Saro Balian,<br><br>　　　　Defendant. | Case No. CR 18-345-JFW<br><br>**DEFENDANT JOHN SARO BALIAN'S BRIEF IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION**<br><br>**[Filed Under Seal Pursuant to Court's July 16, 2018 Order]** |

> *The extraordinary protections afforded by the First Amendment carry with them something in the nature of a fiduciary duty to exercise the protected rights responsibly—a duty widely acknowledged but not always observed by editors and publishers. It is not asking too much to suggest that those who exercise First Amendment rights in newspapers or broadcasting enterprises direct some effort to protect the rights of an accused[.]*
>
> *Nebraska Press Assn. v. Stuart*,
> 427 US 539 (1976)

## Introduction

It is true that the Constitution goes to great lengths to protect freedom of the press, and of course it should. A free press is one essential foundation of our democracy and a bulwark against government overreaching. But it is also true that the same Constitution protects the rights of the accused. And our society's commitment and diligence in preserving those rights is no less a foundation of this democracy.

In balancing the competing interests at stake here, the Court reached the proper conclusion when it issued the TRO in an effort to protect defendant from the harm that will likely flow from the disclosure of his cooperation plea agreement by the Los Angeles Times ("LAT" or "the Times"). It was a balance that tipped even more in defendant's favor by the fact that the LAT reporter who wrote about the plea agreement knew at the time it was protected from disclosure by an order of this Court—an order she disregarded.

When it became clear that the reporter and the Times had no interest in "protect[ing] the rights of [the] accused," the Court had every right, and in fact a

duty, to step in and remedy the situation. Defendant John Saro Balian ("defendant") now respectfully requests that the Court issue a preliminary injunction that restricts further dissemination of his under seal plea agreement.

## Discussion

**THE TRO AND PRELIMINARY INJUNCTION ARE VALID RESTRAINTS ON THE PRESS WHERE NECESSARY TO PROTECT DEFENDANT**

Defendant recognizes that a prior restraint on expression comes with a heavy presumption against its constitutional validity. *Carroll v. Princess Anne*, 393 U. S. 175, 181 (1968); *Bantam Books, Inc. v. Sullivan*, 372 U. S. 58, 70 (1963). The presumption, however, is not absolute. *See Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ("Nor need we accept appellant's invitation to hold broadly that truthful publication may never be punished consistent with the First Amendment.") Rather, in the Ninth Circuit, the Court's order may be upheld where defendant establishes that: (1) the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest, *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir.1978); (2) the order is narrowly drawn, *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 183-84, 89 S.Ct. 347, 352-53, 21 L.Ed.2d 325 (1968); and (3) less restrictive alternatives are not available, *Nebraska Press Association v. Stuart*, 427 U.S. , 539, 563 (1976).

When defendant applied *ex parte* for a TRO enjoining release of details from his plea agreement he faced not only a clear and present danger to his safety and the safety of his family but also an imminent threat to his due process right to be treated

fairly at every stage of the criminal proceeding against him. Defendant signed the plea agreement only on the understanding that it would remain confidential. When it became clear that the LAT intended to disclose the plea agreement, the Court acted both to protect the integrity of its own orders and also defendant's safety. And the Court did so in the only way possible.[1]

Balanced against the defendant's constitutional right to due process is the LAT's admittedly important right to protections against prior restraints. Defendant recognizes the importance of those protections generally and in the context of his own criminal case. The Supreme Court in *Sheppard v. Maxwell*, 384 U. S. 333, 350 (1966) (emphasis added) described the importance of the press in a criminal proceeding in this way:

> A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but **guards against the miscarriage of justice** by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

The Times conduct, however, can hardly be described as "responsible" and certainly seemed to show no effort to guard against a miscarriage of justice; rather, the Times' conduct may lead to a miscarriage of justice.

The first and most obvious consequence of what the Times did is the danger

---

[1] It bears noting that despite repeated attempts by counsel to speak with the LAT's lawyers in the hopes of finding a compromise, the LAT refused. See generally Declaration of Craig H. Missakian ("Missakian Decl.") attached hereto.

that defendant and his family now face. But there is more. Defendant is entitled to fair treatment at every stage of the proceeding against him and the LAT has potentially undermined defendant's ability to obtain the full benefit of his plea agreement bargain. Public disclosure of his cooperation puts people on notice and that could make it more difficult for the government to use information defendant has to share.

The LAT relies primarily on *Florida Star v. B.J.F.*, 491 U.S. 524 (1989) and *In re Charlotte Observer*, 921 F.2d 47, 50 (4th Cir. 1990). Both cases are distinguishable. First, and most important, in *Florida Star* the document at issue in was placed into the public with nothing to indicate it contained information that the reporter could not use—it was at best negligence by all involved. *Id.* at 527. Here, by contrast, the reporter knew and acknowledged that the plea agreement had been ordered sealed by the Court and yet used it anyway.

In *Charlotte Observer*, 921 F.2d at 50, the court observed that "[o]nce announced to the world, the information lost its secret characteristic." Unlike the situation in that case, here it was the **LAT** itself that announced the contents of the plea agreement "to the world." It would be perverse to allow the Times to disregard the Court's order and thereby create its own defense to the TRO and injunction. But that is exactly what occurred. The Times knew that defendant had applied ex parte for an order restraining publication of the article but rather than attempt to resolve the matter or oppose the matter before the Court, it raced to publish the article

before defendant's counsel could provide it with the signed order. Although the gambit paid off and it was able to publish the article, it should not be rewarded for doing so.

## Conclusion

For the reasons discussed above and for those arguments the Court may consider at the hearing, defendant respectfully requests that a preliminary injunction issue preventing further use and dissemination of his under seal plea agreement.

DATED: July 16, 2018　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　_/s/ Craig Missakian_____
　　　　　　　　　　　　　　　　　　Craig H. Missakian
　　　　　　　　　　　　　　　　　　Attorney for Defendant
　　　　　　　　　　　　　　　　　　John Saro Balian

Declaration of Craig H. Missakian

I, Craig H. Missakian, declare that:

1. I am an attorney licensed to practice before all of the courts of the State of California and the attorney of record for defendant John Saro Balian ("defendant" or "Balian") in this case. I make this declaration of my own personal knowledge and, if called upon to do so, would and could testify competently to the facts set forth below.

2. The following is a chronology of events leading up to my emergency request on defendant's behalf for an *ex parte* order restraining the Los Angeles Times ("the Times," "the LAT," or "the paper") from publishing an article that referenced the cooperation provisions of Mr. Balian's under seal plea agreement. To my knowledge, it is still unclear how the LAT reporter was able to obtain the sealed plea agreement in the first place. The events occurred as follows:

**Friday, July 13, 2018:**

    a) **8:16 p.m.**: The LAT reporter Alene Tchekmedyian ("the reporter") telephoned me to say she had obtained a copy of Mr. Balian's plea agreement and asked if I had any comment for the article she intended to write about it. Although the reporter's declaration makes no mention that she knew the document was under seal, she clearly understood that the plea agreement had been sealed by order of the Court. In fact, she stated that she

knew it was under seal but somehow the "document came up" when she clicked on the link. I said I would not comment in anyway and added that if she does write the promised article I hoped she would do the responsible thing and leave out the portions that might put Mr. Balian and his family at risk. She asked if I was referring to the cooperation portions, and I said, "Yes."

b) **8:41 p.m.**: I spoke to the reporter again and reiterated my request that she not publish the article involving the plea agreement. I believe it was in this call that the reporter said that she had spoken to legal counsel and was advised that "because we have the document, we have the right to use it."

c) **9:00 p.m.**: I spoke by phone to the reporter again for the last time that night. She explained that she had written the article but could not locate an editor and so would revisit the article later during the weekend.

d) **9:41 p.m.**: I followed up with an email to the reporter imploring her to reconsider the article and making myself available to speak that night or at any time over the weekend.

e) **10:22 p.m.**: I sent the reporter another email asking to have the LAT's legal counsel contact me "as soon as possible" and make

myself available to talk that night and throughout the weekend. An attorney for the LAT did not contact me until *after* the paper published the article—and the damage had been done. A true and correct of my email is reproduced here:

> **Off the Record/On Background Communication**
>
> Craig Missakian
>
> Sent: Fri 7/13/2018 10:22 PM
> To: 'alene.tchekmedyian@latimes.com'
>
> Alene,
>
> Could you please have the paper's legal counsel contact me as soon as possible? I'm available tonight and throughout the weekend. I'd like to speak to the paper's lawyer before any decision is made about your article. Thank you.
>
> Craig

f) **10:47 p.m.**: I sent another email, this time to the LAT's general counsel, Jeffrey Glasser. The reporter would not give me his name or email address until the next day and shortly before the article was published. I sent my email to the address *jeffrey*.glasser@latimes.com. Although the email did not bounce back, the email I was given the next day was *jeff*.glasser@latimes.com. In either case, Mr. Glasser did not respond to emails sent to either account. A true and correct copy of my first email to Mr. Glasser is reproduced below:

> **Urgent request**
>
> Craig Missakian
> Sent: Fri 7/13/2018 10:47 PM
> To: jeffrey.glasser@latimes.com
>
> Dear Mr. Glasser,
>
> I represent John Balian who is the defendant in a criminal case now pending in U.S. District Court for the Central District of California. I am writing because I learned tonight that a Times reporter, Alene Tchekmedyian, has obtained a copy of Mr. Balian's confidential under seal plea agreement and is planning to write an article in which she intends to discuss certain key provisions of the agreement. Judge Walter, the judge assigned to the case, ordered that the plea agreement be sealed and not available to the public. We are still investigating how Ms. Tchekmedyian was able to obtain a copy but whether it occurred through inadvertence or intentional misconduct by court staff, the fact remains that it is subject to a court order that prevents its disclosure. Such disclosure is not only a violation of the court order but, possibly more important, will put Mr. Balian and his family at a grave risk of harm. In light of that, we hope the Times will choose the responsible (and legal) course of action and instruct Ms. Tchekmedyian not to publish the planned article. Needless to say, should the Times go forward with the article we will weigh all of our options, including seeking to hold the paper in contempt. I would be grateful for the opportunity to discuss the matter with you or someone on your staff as soon as possible. I can be reached by phone at 818-802-9811. Thank you.
>
> Craig Missakian

**Saturday, July 14, 2018:**

    g)     **5:39 a.m.**: I emailed the Court's courtroom deputy and asked if she would contact the Court about the possibility of considering an *ex parte* application for a temporary restraining order that prevented the LAT from disclosing details of the confidential and under seal plea agreement. I then began to work on the application and submitted it to the Court at about 10:00 a.m.

h) **10:23 a.m.**: I received a call from the LAT reporter informing me that the paper intended to publish the article that day. She said she did not, however, know when it would be published. I informed her about the pending *ex parte* application and asked that she hold off until the Court could address the matter.

i) **10:34 a.m. to 10:42 a.m.**: The reporter sent me a series of text messages giving me the contact information for her editor, Shelby Grad, and the paper's in-house general counsel, Jeff Glasser.

j) **10:41 a.m.**: I immediately sent an email to the reporter with a cc to Mr. Glasser informing her, again, of the *ex parte* application and imploring her to delay the article until the Court had a chance to rule. The email also asked the LAT lawyers to contact me as soon as possible. At no time, however, then or at any time before the article was published, did Mr. Glasser or any other LAT lawyer contact me to express a desire to submit anything to the Court in opposition to the *ex parte* request. Notwithstanding their present claims about lack of notice and not being served with the *ex parte* application, it is now clear that the LAT's strategy was to ignore the Court proceeding altogether ***until after it had published the article*** and thereby—at least in their

minds—creat an absolute defense. A true and correct copy of my email is reproduced below:

> **Off the Record/On Background Communication**
>
> Craig Missakian
> Sent: Sat 7/14/2018 10:41 AM
> To: 'alene.tchekmedyian@latimes.com'
> Cc: 'jeff.glasser@latimes.com'
>
> Alene,
>
> As I said over the phone, there is an ex parte application now pending before the court to restrain any use of the under seal plea agreement. I ask that the Times wait until the court has an opportunity to rule on the application. In light of the grave risk of harm publishing the article would create, doing so is not only reckless but illegal and unethical. This is especially true where there is no harm whatsoever to the paper by delaying the article until the court can consider our request. Please have your editor and legal counsel contact me immediately to discuss the matter further. Thank you.
>
> Craig

k) **10:47 a.m.**: I followed up with an email to Shelby Grad, the editor the reporter had identified. This email like the others informed the editor of the *ex parte*, implored the person to contact me, and asked that the article be delayed until the Court could weigh in. I received no response to this email.

l) **11:07 a.m.**: I sent an email to the reporter, Shelby Grad, and Jeff Glasser relaying a message I received from the Court's supervisory clerk that the Court had signed the order and that I would receive a signed copy at about noon. I further stated that the LAT was now on notice and should not publish anything.

What I did not know at the time, however, was that the LAT had already published the article just minutes before at what I understand was 10:55 a.m. In retrospect, in my numerous attempts to discuss the matter with an LAT's lawyer I had unwittingly touched off a race. It was a race to see if the paper could publish the article before the Court ruled on Balian's *ex parte* application. It was a race I lost.

m) **11:28 a.m.**: For the first time I was contacted by an LAT's lawyer, Kelli Sager. Ms. Sager sent me a long email that included the following:

> As you undoubtedly are aware, The Times already published an article concerning your client's plea agreement, and did so before your email that purported to give "notice" of a court order that you anticipate being entered, in response to an ex parte application that you have not served on our clients. Consequently, your demand – which was received after the article was posted on latimes.com – is not well taken for that reason alone. In re Charlotte Observer, 921 F.2d 47, 50 (4th Cir. 1990) (district court erred in issuing prior restraint where information already had been publicly disclosed; "[o]nce announced to the world, the information lost its secret characteristic"). If you have not told the Court that the information you are seeking to restrain already has been published, you should do so immediately.

n) **12:28 p.m.**: I eventually received a copy of the Court's signed order, provided it to Ms. Sager, and I asked if the paper intended to comply by removing the article forthwith. She did not respond.

o) **3:37 p.m.**: The article was still there and so I followed up

with Ms. Sager to ask why the article had not been removed.

p) **4:29 p.m.**: The article is still up but Ms. Sager sent me the following email suggesting that it is taking a long time because it was difficult to assemble needed lawyers and editors on a Saturday. The explanation ignored the fact that the Times could have taken the article down completely in minutes—as the Court's order required— and then put it back up after the lawyers and editors had had a chance to "review the matter." Instead, the paper left the article up for another approximately 45 minutes. Moreover, it appears that the paper had in fact edited the original article at 3:50 p.m. but did not remove the offending language. A true and correct copy of her email is reproduced below:

> **RE: Balian**
>
> Sager, Kelli <kellisager@dwt.com>
>
> ⓘ You forwarded this message on 7/14/2018 4:29 PM.
>
> Sent: Sat 7/14/2018 4:28 PM
> To: Craig Missakian
> Cc: Glasser, Jeffrey (jeff.glasser@latimes.com)
>
> Mr. Missakian:
> Because this is happening on a Saturday, we have had to locate the necessary Times editorial personnel and in-house counsel to review this matter, but the article is being revised to comply with the Court's order and a new version should be posted soon. This is being done without waiver of the Times' rights, or its firm belief that the order is an unconstitutional prior restraint, which it will be challenging.
> Sincerely,
> Kelli Sager

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 16th day of July 2018 at Pasadena, California.

                                                   __/s/ Craig Missakian_____
                                                   Craig H. Missakian