```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION - LOS ANGELES



UNITED STATES OF AMERICA,     )   CASE NO:  2:18-CR-00345-JFW
                              )
              Plaintiff,      )          CRIMINAL
                              )
      vs.                     )      Los Angeles, California
                              )
JOHN SARO BALIAN,             )       Friday, July 13, 2018
                              )       (3:08 p.m. to 3:13 p.m.)
              Defendant.      )       (3:49 p.m. to 4:30 p.m.)


                       DETENTION HEARING


            BEFORE THE HONORABLE ALICIA G. ROSENBERG,
                UNITED STATES MAGISTRATE JUDGE

                   (SEALED PORTION OMITTED)
```

APPEARANCES:

For The Government:     JEFF P. MITCHELL, ESQ.
                        Assistant United States Attorney
                        312 North Spring Street
                        Los Angeles, CA 90012

For The Defendant:      CRAIG H. MISSAKIAN, ESQ.
                        116 Club Road
                        Pasadena, CA 91105

Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       K. Lozada

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

| | |
|---|---|
| 1 | **Los Angeles, California; Friday, July 13, 2018; 3:08 p.m.** |
| 2 | **(Call to Order)** |
| 3 | **THE CLERK:** Calling case number CR-18-345-JFW, the |
| 4 | United States of America versus John Saro Balian. Counsel, |
| 5 | please state your appearances for the record. |
| 6 | **MR. MITCHELL:** Good afternoon, your Honor. Jeff |
| 7 | Mitchell, on behalf of the United States. |
| 8 | **MR. MISSAKIAN:** Good afternoon, your Honor. Craig |
| 9 | Missakian, on behalf of Mr. Balian. |
| 10 | **THE COURT:** All right. So, we are here on the |
| 11 | application for bail review. And have Counsel received the |
| 12 | Pretrial Services report? |
| 13 | **MR. MITCHELL:** Yes, your Honor. |
| 14 | **MR. MISSAKIAN:** Yes, your Honor. |
| 15 | **THE COURT:** All right. So, is the government |
| 16 | continuing to seek detention? |
| 17 | **MR. MITCHELL:** It is, your Honor. |
| 18 | **THE COURT:** All right. All right. So, let's start |
| 19 | with the defense Counsel. |
| 20 | **MR. MISSAKIAN:** Thank you, your Honor. I would like |
| 21 | to make a request that the courtroom be sealed and the |
| 22 | proceedings in this matter be sealed as well, your Honor. For |
| 23 | reasons, I've already discussed with Mr. Mitchell. |
| 24 | **THE COURT:** They've not already been discussed, |
| 25 | however, with the Court. |

1        **MR. MISSAKIAN:**  I understand.

2        **THE COURT:**  Is there -- I don't know that we have a

3   basis, at least I haven't seen any, to close the entire

4   proceeding.  Is there perhaps a particular portion that you

5   would like to have under seal?

6        **MR. MISSAKIAN:**  There certainly will be areas that I

7   believe it would be more than appropriate to seal.  And I'd be

8   happy to make a in-camera proffer of those areas.  The matter

9   that occurred before Judge Walter yesterday was sealed, and

10  it's -- and I had offered to explain the reasons to the Court.

11  I would hope that Mr. Mitchell would agree these are good and

12  appropriate reasons.  I understand that the office has a policy

13  of opposing such requests.  But, I would like to think in this

14  particular circumstance recognizing what we're going to be

15  discussing, that in this case it would be entirely appropriate.

16       **THE COURT:**  Well, here's what I'm thinking about.

17  Because, the initial detention and bail hearings were on the

18  public record.  And also, in terms of the change of plea, the

19  District Judge's order, I believe, is in the public record,

20  unless you have different information.

21       **MR. MISSAKIAN:**  The plea is in the public record,

22  yes.

23       **THE COURT:**  Correct.  So, I think that we should be

24  able to proceed to some extent on the public record, and then

25  when you want to turn to something that you believe should be

1    under seal, you can make the request at a specific time.

2           Let me hear from government Counsel, I see you

3    standing.

4           **MR. MITCHELL:**  Thank you, your Honor.  If I may,

5    Counsel is correct, that the government does have a nationwide

6    policy of objecting to all sealings of proceedings.  However, I

7    agree with Counsel that the nature of the information he would

8    like to talk about is sensitive.  I believe the new information

9    that he has that he would like to present to the Court from the

10   last bail hearing is very similar, if not identical, to the

11   information that led to some of the sealed filings that Judge

12   Walter granted for some of the documents that we filed earlier.

13          So, I think Counsel's points are well taken on those

14   matters.

15          **THE COURT:**  All right.  Why don't we do this then,

16   can we deal with the new material that government Counsel is

17   talking about, first?

18          **MR. MISSAKIAN:**  It's going to be -- it's not

19   impossible to do it, your Honor, but it is going to be somewhat

20   difficult to parse out, and then clear the courtroom, discuss

21   it, bring people back in, seal that portion of the record.  It

22   is going to be logistically very difficult to do that.  And I'm

23   just afraid that I might make a mistake and I might allude to

24   something that should have been sealed when somebody's in the

25   courtroom, and I would just hate to see something like that

1    happen if I just get carried away in the argument, and

2    something jumps out of my mouth that shouldn't because I got

3    confused if somebody was sitting behind me or not.

4          I just think it's better if we could do the whole

5    proceeding under seal, and then maybe after that, if the Court

6    wants me to sit down with the government and go through it, and

7    selectively unseal, that might be a more prudent way to do it.

8    Because, it's just going to be impossible to un-ring the bell.

9    If for some reason something gets out into the public now,

10   we're going to be reading about it in the paper tomorrow.  It's

11   going to be impossible to deal with.

12         **THE COURT:**  Well, all right.  Then let's do this.  I

13   want to take up the new matters that may be sensitive first.  I

14   mean, obviously my decision will then be of public record.  So,

15   we will then open the court.  But, then let's start with the

16   material that is sensitive first, and I will provisionally seal

17   the proceedings until I hear it.  And then make a final

18   determination.  But, I will provisionally seal, so we'll ask

19   that the courtroom be cleared at this point.

20      **(Sealed portion omitted from 3:13 to 3:49 p.m.)**

21         **MR. MISSAKIAN:**  Your Honor, could I provide a copy of

22   the affidavit that we're going to go through?

23         **THE COURT:**  Yes, please.  Thank you.

24      **(Pause)**

25         All right.  So you have the floor.

1          **MR. MISSAKIAN:**  Thank you, your Honor.  And this

2  really goes to the issue of how the government Counsel -- you

3  know, it did it a number of times in the under-seal portion

4  here where he appeared to concede that the evidence the

5  government has supports the charges to which the defendant has

6  pled guilty.  And that's fine.  The problem is the affidavit

7  consists of another 48 pages worth of suggestion and innuendo

8  that really doesn't have a lot to it.  And to say things like,

9  if we find evidence and we're going to bring more charges,

10  that's just inappropriate.  I mean, to talk about the money

11  transfers that somebody was making from Mexico without

12  explaining why there was anything wrong with those money

13  transfers is just inappropriate.  To talk about this loan to

14  Mr. Sargsyan, and say, well, we'll find out if it's a loan or

15  not but we don't know now.  You can't just point to those

16  things without having some basis to suggest it proves or even

17  points to criminal activity.  And there's nothing like that.

18  So --

19          **THE COURT:**  But, I need to bring you back to the

20  question --

21          **MR. MISSAKIAN:**  Yes.

22          **THE COURT:**  -- in front of me, which is risk of

23  flight and risk of danger because --

24          **MR. MISSAKIAN:**  I understand that, your Honor.

25          **THE COURT:**  -- I'm not really addressing the question

```
 1    of guilt or innocence.  So, it's not the -- to me --

 2              MR. MISSAKIAN:  I understand that.

 3              THE COURT:  -- it's not the issue is, is he guilty or

 4    not.  I mean --

 5              MR. MISSAKIAN:  No, but your Honor it does go --

 6              THE COURT:  -- I don't want to go to the merits of

 7    the case --

 8              MR. MISSAKIAN:  Yeah.

 9              THE COURT:  -- but I need to address the allegations

10    as they relate to risk of flight and risk of danger.

11              MR. MISSAKIAN:  I understand that, your Honor.  But,

12    3142(g)(2) go -- one of the factors is the weight of the

13    evidence --

14              THE COURT:  Correct.

15              MR. MISSAKIAN:  -- relating to the charges.  So

16    that's what this all goes to.  You can make allegations and

17    innuendos all day, but at the end of the day, there's got to be

18    some evidence that rises to the level of clear and convincing.

19    Not just probable, but clear and convincing, and I would

20    suggest we're not even close to that.  And what I'd like to do

21    is just go through the affidavit and address some of the more

22    incendiary allegations in here.

23              So, as I read it and I read over the Court's

24     order from the hearing, , the three that I identify that seem

25    to be relevant to the Court's decision were the one involving
```

8

1    OK Auto Body.  There the claim was that Mr. Balian instructed a

2    person who has been identified as CHS-3 to strong-arm the owner

3    of the body shop, a body shop, into paying money.  That

4    according to CHS-3.

5           The second incident is an extortion involving Beazo

6    (phonetic) Kazarian, an alleged Armenian organized crime

7    figure.  The claim there was that Balian instructed a Mexican

8    Mafia leader to extort this Armenian organized crime figure and

9    that Balian acted as the bag man for the money.  Again, this is

10   according the confidential source number 3.

11          Then lastly, there was an allegation that Mr. Balian

12   had destroyed evidence.  The claim was that -- and I'll read

13   it.  This is from the affidavit:  "Balian has attempted to hide

14   or destroy evidence in the past, when he disposed of the

15   firearm that was used in a drive-by shooting."  This is again -

16   - those are the agent's words in the affidavit, but the

17   information is again coming from CHS-3.

18          **THE COURT:**  And could you, for the record, just state

19   the paragraph that you were referring to?

20          **MR. MISSAKIAN:**  Yeah, I will.

21          **THE COURT:**  Okay.

22          **MR. MISSAKIAN:**  I'm going to go through all of those,

23   your Honor, I just wanted to give you a little preview of

24   coming attractions.  So, I will go through it all in grave

25   detail.

1          So, in order to understand this and I have to give

2    you some of the background facts, and these are coming from the

3    affidavit.  So, the first background fact that's relevant is --

4    comes in footnote 19.  Jose Loza is arrested in May of 2016.

5    So, footnote 19 is at tab number 1 in the document that I gave

6    to the Court.  Also, on that same page you have a block quote.

7    And this is a quote from the confidential source number 3, in

8    which he says he meets Balian after Trigger got busted.  So

9    that's about a third of the way down to that block quote in

10   paragraph 66.

11         Then if we look at footnote 20, also at tab 1. CHS-3

12   identified Trigger as a gentleman with the initials J.M. -- I

13   assume it's a man -- from the King Cobra street gang and J.M.

14   was arrested on August 16th, 2016.  So, if we accept those two

15   statements, it appears that CHS-3 met Balian for the first time

16   after both Loza and Trigger were arrested, so that would be

17   some time after August, 2016.  And Mr. Balian, if called to

18   testify, would testify that he met the Confidential Source

19   Number 3 in September or October of 2016.

20       **(Pause)**

21         So, back to the -- let's go -- start with the

22   allegation that somehow Balian acted as a bag man in connection

23   with the Kazarian extortion.  So, remember Loza is arrested in

24   2016, Loza is an alleged Mexican Mafia member.  And in

25   paragraph 72, this is at tab number 3, Loza allegedly extorted

1   Kazarian for $100,000 after Kazarian arrived at MDC.  It

2   doesn't say exactly when, but we know that Kazarian got to MDC

3   in July of 2017, when he was arrested.  That's paragraph 72.

4           CHS-3 claims he picked up $50,000 of this $100,000

5   extortion from an unknown Armenian male at Whole Foods.  And

6   then -- this is paragraph 73 at tab number 2. After picking up

7   that money, he says and I quote, "He personally delivered it

8   directly to Balian."  Paragraph 73, page 33, tab 2.  Obviously,

9   it's a damning allegation but if you read the affidavit and

10  accept what it says, there's a problem.  Kazarian, according to

11  the affidavit, was not arrested until July of 2017.  CHS-3, the

12  person that's claiming that Balian did all these things, was

13  arrested in April of 2017, months before.  So, the question

14  becomes, how does CHS-3 meet anyone, including Balian at Whole

15  Foods or anywhere else, and deliver money to him if he's

16  sitting in jail at that point?

17      **(Pause)**

18          The next issue is -- and it suffers from a similar

19  problem -- involves the Okay Auto Body shakedown where Balian

20  is supposed to have instructed CHS-3 again to shakedown the

21  owner of Okay Auto Body.  According the affidavit -- now we're

22  at paragraph 74, tab 2 -- CHS-3 told the detectives about

23  another extortion that Balian instructed him to initiate on

24  behalf of Loza.  Again, Loza is the Mexican Mafia member.

25  According to CHS-3, Balian directed CHS-3 to go to Okay's Auto

1   Body and just make up reasons to hit the guy for money.  Next

2   paragraph, also tab 2, paragraph 75, the agent in the affidavit

3   says, "I have reviewed an L.A.P.D report made by Okay, the Auto

4   Body, regarding an extortion which took place between December

5   of 2014 and January of 2015."  And later, CHS-3 identifies

6   himself on a video as being at that body shop.

7        The same problem, damning allegations but this an

8   extortion that took place in December of 2014 or January of

9   2015, and by his own statement, CHS-3 does not meet Balian

10  until August, September, October of 2016.  So how in the world

11  could that be?  Either the guy's a time traveler or he's just

12  not telling the truth.

13       So, let's go to the last one.  There's the claim that

14  Mr. Balian hired two guys and offered to pay them $100,000 to

15  do a drive-by shooting to scare somebody, and then got the

16  weapon used in the drive by shooting, and somehow destroyed it

17  or disposed of it.  It's obviously a very troubling allegation

18  in the complaint.  According to CHS-3, and I'm quoting here,

19  "Balian offered CHS-3 and J.M. $100,000 to scare an

20  individual."  A $100,000 just to scare somebody.  But, CHS-3

21  wasn't interested.  He said -- according to the affidavit, CHS-

22  3 said that he was unable to participate, but provided his gray

23  Honda Pilot to J.M.  Nowhere in this affidavit do we learn why

24  CHS-3 was unable to participate, why he could not take five

25  minutes out of his busy schedule to make $50,000 scaring

1    somebody.  We don't hear that.  But, you need to know that

2    critical answer to assess the credibility of what he's saying,

3    but it's nowhere to be found.

4           So, next CHS-3 gets a call from J.M.  J.M. apparently

5    did the scaring on his own.  J.M. tells him that he thinks he

6    may have killed the person he was just supposed to scare.

7    That's tab 4, paragraph 80.

8           **THE COURT:**  I think it says -- it says, "J.M. tells

9    CHS-3, I think I hit -- shot him."  I don't know that he says,

10   I think I killed him.  My copy, at least, says, "I think I shot

11   him."

12          **MR. MISSAKIAN:**  If that's what the copy says, then I

13   wrote down the wrong word.

14          **THE COURT:**  Okay.

15          **MR. MISSAKIAN:**  Let's see, shot him, yes, "I hit

16   him."

17          **THE COURT:**  Well, he does later say -- he says, "I

18   think I shot him."  And then later in the conversation, he

19   says, "I think I killed him.  The area's all blocked off."

20          **MR. MISSAKIAN:**  Yes.

21          **THE COURT:**  So, it may be just two different

22   statements.

23          **MR. MISSAKIAN:**  Yes.

24          **THE COURT:**  Okay.

25          **MR. MISSAKIAN:**  Same paragraph, though.  Paragraph

1   80.   Obviously, another incendiary allegation, but again what

2   we believe is the same problem.   The agents then went and did

3   some additional investigation and they state in the affidavit

4   that the drive-by shooting occurred on July 14th, 2016.   This

5   is tab 4, paragraph 83.   Again, this a date prior to the date

6   when CHS-3 himself says that he met Balian.   So, again, how is

7   he getting a gun and giving it to Balian in July if he doesn't

8   meet the guy for the first time at the very earliest until

9   August?   Again, I don't -- and again this goes to -- we're not

10  trying to determine guilt or innocence here.   I'm just trying

11  to address the issue of the weight that should be given to some

12  of the more incendiary allegations in the affidavit.

13          So, those are the things I wanted to walk the Court

14  through in the affidavit.   I do have some argument, but I'll

15  pause here to see how the Court wants to proceed.

16          **THE COURT:**   Let me ask government Counsel, do you

17  want to respond at this point to the allegations in the

18  affidavit or can we just do it all at one time?

19          **MR. MITCHELL:**   The government has no preference.

20          **THE COURT:**   All right.   So, let's continue --

21          **MR. MISSAKIAN:**   Okay.

22          **THE COURT:**   -- with your argument.

23          **MR. MISSAKIAN:**   Thank you, your Honor.   So, let's

24  start with the issue of danger.   And the issue there, of

25  course, is whether or not there's clear and convincing evidence

14

1   that Mr. Balian presents a danger to the community.  And in

2   reading over the affidavit -- and I've alluded to it many times

3   during this argument, so forgive me if I sound like a broken

4   record.  Innuendo alone is not enough.  There was a time when I

5   was doing organized crime cases and there was a pretty well-

6   known case out of the First Circuit, *U.S. versus Patriarca*.

7   And I remembered it and I went back to it, and it stands for

8   the very basic proposition.  The gist in that case -- it was an

9   Italian Mafia case, and it said mention of the mafia is

10  insufficient in itself to carry the day for the government.

11          And that's what I felt when I was reading this

12  affidavit, that, you know, they threw in just enough reference

13  to the Armenian Mafia and the Mexican Mafia, but just

14  mentioning it is -- at the end of the day, it's not enough.

15  There has to be some level of evidence, and clear and

16  convincing evidence to demonstrate that those allegations have

17  some basis to them.  And at this point, you know, maybe the

18  government is going to continue to do its investigation, maybe

19  they will develop evidence of additional charges, that's fine.

20  That's their right and maybe they will.

21          But, this is the situation we find ourselves in

22  today, and the person and the situation we're trying to assess

23  now.  So, I think even though it's very difficult to un-ring

24  the bell, and I know that this affidavit contains a number of

25  red flags.  But, red flags alone is not sufficient.  It's got

1    to be clear and convincing evidence.  I would just say, it does

2    not rise to that level, certainly with respect to danger.

3            And as I tried to demonstrate by going through the

4    affidavit in some detail, there's also some probably very good

5    reason to take what these cooperators are trying to say against

6    Mr. Balian with a grain of salt.  These are people that are in

7    custody.  I believe all of them are.  They're obviously trying

8    to help themselves, and if they can help themselves by pointing

9    a finger at a high-profile cop, so be it.  That's going to help

10   them a lot if they make that stick.  But, that's not what, we

11   should recognize that and consider it in deciding how much

12   weight to give what they've said -- to what they've said.

13           Now, in the affidavit, to his credit, the agent says

14   at paragraph 8, "I believe Balian has obstructed justice,

15   provided false and misleading statements to federal agents, and

16   accepted a bribe."  That's at paragraph 8.  That's what he says

17   he believes that Mr. Balian has done.  And Mr. Balian pled

18   guilty to those very crimes yesterday.  He may believe that

19   there's other -- that further investigation could result in

20   additional charges and, again, that's fine.  But, again, what

21   we're dealing with here are those three charges.

22       **(Pause)**

23           So, you take that and you balance that against who

24   Mr. Balian is as a person.  Obviously, he has no criminal

25   history up until now.  He was a respected police officer for

1  many years.  He was a respected member of the community, and

2  he's been a part of that community for a long, long, time.  So,

3  those two things, giving less weight to the allegations of the

4  cooperators referred to in the affidavit and balancing that

5  against Mr. Balian's record prior to this, I think it's very

6  difficult to say that there's clear and convincing evidence

7  that he presents a danger to the community.

8       And some -- there's some proxy for coming to that

9  conclusion, is look at the affidavit.  They knew about the

10 Gordo intimidation plot back in May, I believe it was -- May of

11 2017.  They learned about this intimidation -- the

12 investigators learned about that alleged intimidation plot back

13 in May of 2017, a year before he was arrested.  So if they

14 viewed him as such a danger to the community, why did they wait

15 a whole year?

16      And the same as regard to CHS-3 allegations.  They

17 learned about what CHS-3 said -- I've got it here -- in October

18 2017.  And I also believe there are good reasons to discount

19 anything that that cooperator has to say, but the fact remains

20 is after they heard about it, they still waited about eight

21 months to arrest him.

22      And, you know, the question remains, what is he a

23 danger of doing?  I know this was discussed a little bit at the

24 last hearing.  I think the argument there was he's not a police

25 officer anymore, he doesn't have access to police resources, so

1    he can't tip people off, he can't access databases, and that's

2    fine, and that's true.  But the Court, I think, was concerned

3    that maybe he could go out and he could do other things with

4    maybe some of his -- the people he's alleged to associate with.

5            Well, the fact remains is if Mr. Balian goes back out

6    in the community, nobody -- nobody from Armenian organized

7    crime, Mexican Mafia, the guy selling illegal hand bags on the

8    street is going to have anything to do with him.  This is a

9    police officer who was arrested.  He's now on the street.  Is

10   somebody going to take a chance involving him in some kind of

11   criminal conduct or are they going to take direction from him

12   to go extort or intimidate a witness?  Of course not.  Because,

13   they're going to think, this guy's trying to set me up.  So, I

14   think it's fair to say that he's not a danger to really do

15   anything if he is allowed back into the community.

16           So, as I said, it's hard to un-ring the bell after

17   that affidavit but -- and we can disagree, and I'm sure

18   Mr. Mitchell disagrees about the strength of the evidence and -

19   - but I hope we can agree that the evidence, at least on

20   danger, falls far short of the clear and convincing standard.

21           With respect to flight, now we have defendant -- he's

22   plead guilty to three offenses.  Mr. Mitchell alluded to this

23   earlier.  He's not facing life.  We all know that Judge Walter

24   could sentence him up to the statutory maximum if he wants to.

25   But, as we sit here today, his guideline range is 18 to 24

 1    months without any other reductions that may apply.  And he's

 2    done two months already, two months in the special housing unit

 3    at MDC.  He's been transferred, but he was there for almost two

 4    months before that transfer.  So, with his whole life here, in

 5    this community, since the age of six, his family is outside.

 6    They can come in if the Court would like to address them.  His

 7    life is here, his family is here, his children are here.  His

 8    business is here, his livelihood is here.  Who in their right

 9    mind would give all of that up for the life of a fugitive to

10    avoid a few months -- you know, a few months in jail, and then

11    most likely a few months in a halfway house?  Nobody in their

12    right mind would ever consider doing that.  He's not going to

13    flee to France, and he's not going to flee anywhere to do that.

14    He's already done his two months in jail, he's handled it well.

15    It has not been a problem for him, but he's not going to flee

16    to avoid a few more months, not with these charges.   It makes

17    little sense.

18          He's trying to do the right thing, your Honor.  He's

19    trying to make amends for what he did.  At the appropriate time

20    he will stand before Judge Walter and in his own words, far

21    better than I could ever explain, he will explain how this one-

22    time respected cop took a step outside that line and where it

23    led him.  Obviously, he's not proud of what he did.  I think

24    he's struggling to understand how it happened in the first

25    place.  But, this is a man who is trying to make amends, he

1    took responsibility very quickly.  And he has done everything

2    he can to help the government and no doubt will -- so with all

3    that in  mind, your Honor, I would say he is not a flight risk

4    and the evidence is not sufficient to determine that he is a

5    danger to the community and that there is a way to ensure his

6    appearance.

7          And I would just go back to what the Pretrial

8    Services originally recommended, which was a justified surety

9    bond.  I believe it was in the amount of 100,000 -- $150,000.

10   His mother is here today; she is willing to put up the house to

11   ensure that Mr. Balian makes his court appearances.  As the

12   Court well knows, that can take a while.  So, if the court is

13   considering allowing Mr. Balian to be out on bail, then I would

14   simply ask that it'd be a forthwith release.  She will sign an

15   unjustified surety bond which will be replaced as soon as

16   possible, which I'm told could be as early as the middle of

17   next week to put that house up for security.  Thank you, your

18   Honor.

19          **THE COURT:**  All right.  Thank you.  Government

20   Counsel?

21          **MR. MITCHELL:**  Yes, thank you, your Honor.  I'd just

22   briefly like to address some of Counsel's concerns with my

23   arguments about two points that I made during the under-seal

24   portion relating to, first, the money that went to the

25   girlfriend.  My intention was not to argue that there was a new

1  crime.  My discussion of the wire transfers was merely to rebut

2  their argument that was not supported by any evidence but the

3  argument that the defendant was traveling back and forth on a

4  daily basis because the girlfriend lived in Mexico.  And the

5  wire transfers were evidence that I believe that rebutted that.

6  And that was my only intention of talking about the wire

7  transfers.

8           As for the fraudulent activity and the credit card

9  charges to the individual that's currently under investigation

10 and the wire transfer to that person, the government's

11 discussion of the fraudulent activity was merely to kind of

12 address whether or not there really was a loan.  And I think it

13 undermines the proposition that it was a loan, if this person

14 had access to millions of dollars that they had obtained in the

15 year before.  And so I wasn't intending to argue that there was

16 a new crime that the defendant was a part of, but merely to

17 kind of rebut the argument that there was necessarily a loan.

18          As for the argument related to the affidavit, in

19 particular, the allegations related to the Okay Auto Body, Pezo

20 (phonetic), or the being a bag man for this Armenia organized

21 crime figure and that the defendant may have destroyed

22 evidence.  While at this point these are only allegations, I

23 don't believe that these allegations are any more serious,

24 prejudicial, or inflammatory than what the defendant admitted

25 to when he pled guilty to the three counts of the information,

1    which was bribery, obstruction of justice by tipping off a lead

2    gang member that law enforcement was about to execute search

3    warrants of the entire gang the night before, and the lying to

4    the FBI and Homeland Security about his ties with Armenian

5    organized crime and the Mexican Mafia.  So, while those three

6    allegations are just allegations, I don't think that they weigh

7    so much more in favor of detention than what he's already

8    admitted to in the guilty plea.

9             As for CHS number 3 and whether or not -- I think in

10   Counsel's words-- whether or not he was a time traveler or

11   telling the truth.  I don't think those are the only two

12   options.  It's entirely possible that CHS-3 was just confused

13   on exactly when he met the defendant.  Perhaps it was the year

14   before.  We're talking several years ago.  So, going through

15   the affidavit and trying to kind of like find inconsistencies

16   here and there, while I think are appropriate for trial, I

17   don't think it really necessarily gets us further along at this

18   hearing.  CHS-3 was corroborated --

19             **THE COURT:**  But, let me stop and ask you about

20   something because some of these alleged inconsistencies have to

21   do with law enforcement going back into its own files and

22   searching for reports about similar crimes that CHS-3 is

23   reporting to them.  So, I mean, I don't know that from this we

24   can figure out specific dates.  It not only it seems to me

25   depends on CHS-3 getting his years and months correct, but also

1    whether law enforcement has correctly identified police reports

2    that match what CHS-3 is talking about.  Do you see what I'm

3    saying?

4           **MR. MITCHELL:**  Yes, your Honor.  I do see the Court's

5    point, although law enforcement is confident that it had

6    correctly identified the shooting date if that's what the

7    Court --

8           **THE COURT:**  Okay, thank you.  That's good to know.  I

9    mean, I didn't get -- I didn't understand that from the

10   affidavit.  So, you are saying that law enforcement is fairly

11   confident about at least the incident?  Because there are many

12   of them in this affidavit --

13          **MR. MITCHELL:**  There are.

14          **THE COURT:**  -- where the law enforcement has

15   identified a police report or other documentation, you are

16   saying law enforcement is confident that it has matched the

17   correct report to what CHS-3 is describing?

18          **MR. MITCHELL:**  Yes, in particular, relating to the

19   drive-by shooting.

20          **THE COURT:**  Okay.

21          **MR. MITCHELL:**  It was related to the shooting of the

22   son of an individual referred to in the affidavit as L.T.  But

23   going back to CHS-3, his information was corroborated when he

24   told us about the tipping off of Jorge Grave (phonetic).  When

25   the defendant plead guilty he admitted to that.  Cell tower

1  records of the defendant show that he was, in fact, outside

2  CHS-3's home shortly after the shooting.  So -- and in addition

3  -- I may have neglected to mention this, but in addition to

4  what he has plead guilty to, there was also the information in

5  the affidavit which I don't believe is contested about whether

6  it's witness intimidation or bribery of Patlan.  But I believe

7  that is information that also weighs in favor of flight risk

8  and danger to the community as well that I don't believe is

9  contested.

10       THE COURT:  So, just to go back, I just want to make

11  sure that we're talking about the same paragraph.  So, you're

12  talking about cell phone records that place the defendant in

13  the same vicinity of CHS's home, you said during the shooting.

14  Is this the shooting that they're talking about in paragraphs

15  82 and 83?

16       (Pause)

17       MR. MITCHELL:  Yes, your Honor.  I believe that is

18  correct.  So, afterwards, there was the disposal of the gun.

19  Actually, your Honor, I'm sorry.  I may be confusing my

20  shootings here.  But the cell tower records were on the night

21  in which there was loaning of the Honda Pilot to an individual

22  to scare somebody.  That person believes he accidentally shot

23  the person.  The defendant then arrived outside of CHS3's

24  apartment building.

25       THE COURT:  Yeah, I think we're talking about the

24

1   same incident on paragraph 81 where it says, "At which time

2   CHS-3 gave the gun to Balian"?

3           **MR. MITCHELL:**  Yes, thank you, your Honor.  I do see

4   that.

5           **THE COURT:**  So, this is the same incident.  What

6   you're saying is that you have cell phone records that show

7   that the defendant was in the vicinity of CHS-3's residence

8   after that shooting?

9           **MR. MITCHELL:**  Yes, your Honor.  I believe that's in

10  paragraph 84.

11      **(Pause)**

12          **THE COURT:**  All right.  Thank you.

13          **MR. MITCHELL:**  And then on to the question of why did

14  we wait eight months in order to charge the defendant.  I can

15  go into to the government's decision-making here, but one of

16  the major factors was -- well two factors.  One, every time we

17  were getting ready to charge the defendant, it was initially

18  with the bribery, but we just found out more information.  We

19  talked to more sources, and they told us about more criminal

20  activity which we had to investigate.

21          And then, finally, after our final interview with

22  CHS-3, we had to wait until there was a cooperation agreement

23  signed where he would agree to testify on our behalf.  And that

24  took some time to do because it wasn't negotiated by the U.S.

25  Attorney's office.

1       **(Pause)**

2               And, I'm sorry.  Just for clarification, that was

3       relating to CHS-3's cooperation agreement.

4               **THE COURT:**  Correct.

5               **MR. MITCHELL:**  So --

6               **THE COURT:**  And then so is that -- I don't mean to

7       interrupt you, but is that your argument now on the risk of

8       danger?  Is there anything else that you want to add?

9               **MR. MITCHELL:**  That was for both, your Honor.  And I

10      don't have anything additional to add unless the Court has

11      questions.

12              **THE COURT:**  About -- on the risk of flight, you're

13      talking about the issues of Mexico and France that we discussed

14      before?

15              **MR. MITCHELL:**  Right.  So, Mexico and France, I

16      believe that there was no additional information for France.

17      And as for Mexico, we contest the uncorroborated -- or the

18      allegation that's not supported by any evidence that Counsel

19      made earlier.

20              **THE COURT:**  All right.  Thank you.  Does defense

21      Counsel wish to respond --

22              **MR. MISSAKIAN:**  I do, your Honor.

23              **THE COURT:**  -- to what government Counsel has argued?

24              **MR. MISSAKIAN:**  Yes, your Honor, definitely.  Okay,

25      first with regard to the loan payments.  You know, I don't know

 1   what case the government has or does not have against Edgar

 2   Sargsyan, but it should be irrelevant to the considerations

 3   here.   There was some suggestion that Mr. Sargsyan had millions

 4   of dollars in his accounts the year before Mr. Balian made this

 5   loan.   Well, that's fine, but there's a number of chains --

 6   links in the chain that are missing between the millions they

 7   saw in the account one year and the need for a loan later on.

 8   And you fill -- you can fill that with an inference or innuendo

 9   or whatever, but the fact remains -- does the government have

10   evidence to proffer to show that there were millions in those

11   accounts when that loan was made?   If they do, I'd like to see

12   that evidence because I haven't seen it.   I accept the proffer

13   that there were millions in that account the year before, but

14   Mr. Balian would testify that in the year after that,

15   Mr. Sargsyan needed money.   And he helped him out with a loan,

16   and he's been paying that loan back since then.   So, that's one

17   thing.

18          I would take exception to the notion that the crimes

19   that Mr. Balian pled guilty to yesterday, obstruction 1001 and

20   accepting a bribe of $10,000 equates morally, ethically,

21   legally in any way, shape, or form to the incendiary

22   allegations in the complaint that he was trying to intimidate

23   witnesses, that he paid somebody $100,000 to go and shoot a gun

24   at somebody, somebody who apparently may have been actually

25   shot.   To suggest that those kinds of things are equivalent,

1   that the charges he pled guilty to are no less inflammatory

2   than those allegations, I think is just really ignoring the

3   nature of those offenses.   Attempted murder is a very, very

4   serious offense.   And in any court in the land, it is far more

5   serious than 1001 bribery, or even obstruction of justice.   So,

6   I don't accept that premise.

7              With regard to CHS-3 and whether -- how much weight

8   we should give to the statements in the affidavit, I said that

9   he's either lying, he's a time traveler.   Mr. Mitchell came up

10  with a third option, that he's confused.   That may be true.   He

11  may be confused.   Obviously, that affidavit does not add up in

12  many significant respects.   But we just can't explain it away

13  by saying he might be confused.   The government submitted that

14  affidavit.   They came into this court and asked this man, do

15  you want to take this man's freedom away based on those

16  statements.   And now they try to explain it away by saying, oh

17  maybe he was confused, it happened a few years before.   Well,

18  these are serious matters and you can't just walk in and say

19  that somebody may have been confused.

20              And with regard to the cell phone records, the cell

21  phone records will show that Mr. Balian was in that area

22  several hours after this alleged shooting.   Several hours.   And

23  he's already talked to the agents about this, and he was -- and

24  there's no evidence whatsoever other than what CHS-3 says that

25  he received the gun.   And where they come up with, you know,

1  destruction of the gun, I don't know.  There's no statement

2  about that whatsoever in the affidavit.  But they keep

3  referring to it as Mr. Balian destroying the weapon, and

4  there's really nothing to support that whatsoever.

5         With regard to Patlan and the witness intimidation,

6  yes, that is contested.  There was no attempt to intimidate

7  that witness to change his story.  As I proffered at the very

8  beginning, the effort was to try to get Mr. Patlan to tell the

9  truth about what appears to be a very tainted and disturbing

10  photographic six-pack procedure, not only involving Patlan, but

11  also involving Angela Lewin as well.  So, yes, that part of it

12  is contested.

13         So with those things, your Honor, I don't think

14  there's anything else I want to respond to.  If you could just

15  give me a moment to look at my notes, I would appreciate it.

16         **THE COURT:**  Sure.

17         **MR. MITCHELL:**  Your Honor, if I may really quickly

18  just jump in here?  I just wanted to point out that I neglected

19  to respond to two points that Counsel made that I thought were

20  well taken.  One, Counsel did accurately describe the -- what

21  we believe to be the guideline range as 18 to 24 months.  And I

22  think Counsel's argument that the defendant showed

23  extraordinary acceptance of responsibility by pleading guilty

24  very quickly is also a point that's well taken.  I'm not sure

25  it goes to flight risk or danger to the community.  I think

1    this is probably more of an issue for sentencing.  But, I think

2    Counsel's point is well taken on that matter.

3            **THE COURT:**  Okay.  And then is there anything that

4    you wish to add?

5            **MR. MISSAKIAN:**  No, your Honor.  Thank you.

6            **THE COURT:**  Okay.  All right.  So, during the course

7    of this argument, I've had the chance to go back over the

8    affidavit and, of course, I remember the initial bail and

9    detention hearing.  And, you know, first of all, may I say to

10   you, Counsel, your presentation was excellent and the same to

11   you, government Counsel.  The presentations here are really

12   excellent and shows that both sides have really dealt with the

13   evidence at least up to this point in time.  And as I said, I'm

14   looking at these allegations to the extent they inform me about

15   risk of flight and risk of danger.

16           And I've listened to Counsel and I have to say though

17   that after considering everything before me, including the able

18   arguments of Counsel, I see no reason to change my initial

19   order of detention.  Certainly, we're still looking at the

20   nature of the offenses.  We've talked a lot today about some of

21   the allegations in the affidavit, but there are, of course,

22   others.  And there are other CHS's, CHS-1, 2, as well as 3.

23   And extensive allegations about extortion in many different

24   contexts, as well as the shootings that we discussed in terms

25   of one of the extortion allegations.  And that is of serious

 1  concern to the Court, that this defendant does present a risk

 2  of danger by clear and convincing evidence if released based

 3  upon his significant role in the allegations identified in the

 4  affidavit.

 5          I take into account Counsel's arguments that the

 6  investigations are ongoing and right now, you know, the

 7  defendant has pled guilty to three charges, and it is unknown

 8  whether additional charges will be brought.  I understand that.

 9  But I have to look at these allegations, as I said, to the

10  extent they inform me about risk of flight and risk of danger.

11  And the allegations are quite serious.  And so for that reason,

12  I do not change my order of detention.

13          As to the flight risk, I'm not sure that anything has

14  really changed on that score.  The family in France is

15  obviously a concern.  There's a strong dispute between Counsel

16  as to the significance of the numerous trips across the border

17  into Mexico.  One side argues that the girlfriend was living in

18  Mexico; the other side presents arguments that she was living

19  in Texas and that, you know, this -- the proffered innocent

20  explanations for 50 trips across the border isn't really what

21  it seems.  But I think that's where we were before.  I think

22  that the concerns about risk of flight really have not changed,

23  both based on France and based on Mexico.

24          So, that will be the order of the Court.  The

25  application for bail review is denied.

1          **MR. MITCHELL:**  Thank you, your Honor.

2          **THE CLERK:**  All rise.  Court is adjourned.

3      **(Proceeding ended 4:30 p.m.)**

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    _January 7, 2019_


                    TONI HUDSON, TRANSCRIBER