Craig H. Missakian (SBN 125202)
craig@cmlawpartners.com
Law Offices of Craig H. Missakian
116 Club Road
Pasadena, CA 91105
Phone: 818-802-9811

Attorney for Defendant
John Saro Balian

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: CR 18-345-JFW |
|---|---|
| Plaintiff, | REDACTED SENTENCING POSITION PAPER OF DEFENDANT JOHN SARO BALIAN |
| vs. | |
| JOHN SARO BALIAN, | DATE: March 8, 2019 TIME: 8:30 a.m. COURTROOM: 7A |
| Defendant. | |

Defendant John Saro Balian, by and through his counsel of record, respectfully submits his sentencing position paper filed concurrently with the related Declaration of Craig H. Missakian and Objections to Presentence Report.

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................. 5

II. § 3553 FACTORS ............................................................. 8

   A. <u>History and characteristics of defendant</u> ............................ 9

   B. <u>Nature and circumstances of the offense</u> ......................... 18

   C. <u>Seriousness of the offense, just punishment, respect for the law</u> ........ 19

III. GUIDELINES CALCULATION .......................................... 19

   A. <u>Plea agreement</u> ......................................................... 19

   B. <u>Presentence report</u> .................................................... 19

   C. <u>A 1 level departure is warranted under § 5K2.0(c)</u> ........................... 26

      *1. § 5H1.6—Family ties and responsibilities* ...................................... 26

      *2. § 5H1.9—Criminal activity for livelihood* ...................................... 30

      *3. § 5H1.11—Public service prior good works* ................................. 30

      *4. Other factors* ................................................................... 31

V. CONCLUSION ................................................................... 39

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................ 9

*Koon v. United States*, 518 U.S. 81 (1996) .............................................................. 31

*Peugh v. United States*, 133 S.Ct. 2072 (2013) ........................................................ 9

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D. N.Y., 2006) ........................... 31

*United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000) ........................................ 27

*United States v. Austin*, 309 Fed. Appx. 573 (3rd Cir. 2009) ................................. 31

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) ............................................. 9

*United States v. Carty*, 264 F.3d 191 (9th Cir. 2001) ............................................ 31

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) .............................................. 9

*United States v. Claymore*, 978 F.2d 421 (8th Cir. 1992) ...................................... 25

*United States v. Foreman*, 926 F.2d 792 (9th Cir., 1991) ...................................... 24

*United States v. Gould*, 983 F.2d 92 (7th Cir. 1993) ............................................. 23

*United States v. Harrington*, 82 F.3d 83 (5th Cir. 1996) ....................................... 23

*United States v. Lange*, 918 F.2d 707 (8th Cir. 1990) ........................................... 25

*United States v. Long*, 122 F.3d 1360 (11th Cir. 1997) .......................................... 24

*United States v. Pedersen*, 3 F.3d 1468 (11th Cir., 1993) ...................................... 23

*United States v. Reccko*, 151 F.3d 29 (1st Cir. 1998) ............................................ 24

*United States v. Rehal*, 940 F.2d 1 (1st Cir. 1991) ................................................ 23

*United States v. Roser*, 2013 WL 3014122 (6th Cir. 2013) ................................... 31

*United States v. Spano*, 476 F.3d 476 (7th Cir. 2007) ........................................... 31

*United States v. Williamson*, No. ED-CR-13-00021-JLQ (C.D.C.A. 2013) .......... 31

**STATUTES**

18 U.S.C. § 1512(c)(2) ................................................................ 25

18 U.S.C. § 3553(a)(2) ................................................................. 8

**OTHER AUTHORITIES**

USSG § 1B1.4 ......................................................................... 23

USSG § 2B1.1 ......................................................................... 25

USSG § 2J1.1 ......................................................................... 25

USSG § 2J1.2 ......................................................................... 25

USSG § 3C1.1 ......................................................................... 26

USSG § 3D1.1 ......................................................................... 19

USSG § 3D1.4(a) ...................................................................... 25

USSG § 3E1.1 ......................................................................... 19

USSG § 5H1.6 ..................................................................... 27, 28

USSG § 5K2.0 ..................................................................... 26, 36

USSG § 5K2.0(c) ...................................................................... 19

USSG § 5K2.0(c)(1) and (2)(A) ....................................................... 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

During a short time in an otherwise law-abiding life devoted to serving others, John Balian made serious errors in judgment and in so doing betrayed the high standards of conduct to which he had always held himself. He describes this time in his life as "sleep walking" and then waking up to realize what had occurred—and not liking it. By the time of his arrest, Mr. Balian was wide awake and eager to do the right thing. He quickly accepted full responsibility for his actions,                    and now comes before the Court prepared to accept a just punishment—but also eager to show he is not the same person who committed these offenses, as he explains in his letter to the Court.[1]

In arriving at a just punishment, Mr. Balian asks that the Court weigh not only what he did here but also what he has done his entire life, including the 20-plus years he served as a model police officer—with dozens of commendations to prove it. Both as a Montebello police officer, where he was Officer of the Year, and with the Glendale Police Department, where he was selected as public information officer to be the face of the department, John Balian worked hard, took immense pride in his work, was a team player, and was selfless and brave. He singlehandedly saved the life of at least one person—while putting his own at risk—and helped many others. As one grateful father said in a note of thanks:[2]

> Hello officer Balian,
>
> I called your office about a month ago, and I was told you were talking [sic] sometime off. I hope all is well, and you were just taking some much needed rest.
>
> I wanted to thank you, for I believe you may have saved my son's life. Efrén is doing well, his boys are growing up so quick. The oldest is

---

[1] *See* Declaration of Craig H. Missakian ("Missakian Decl."), Ex. A.

[2] Email, Efren Sandoval to John Balian, dated April 2, 2018. See Missakian Decl., Ex. C, at 26. This email along with other letters of recognition, commendations, and work evaluations for Mr. Balian are included as Exhibit C to the Missakian Decl.

getting awards at school left and right. Efrén has two jobs, and started his own car detailing company. Very professional, with work uniform and everything. I'm glad he stirred [sic] in the right direction now. Thanks for believing in him. For putting in a good word. He really is a good kid. He just met some bad people, but learned a valuable lesson.

Take care buddy,
Efrén Sandoval

Others praised Mr. Balian as well, describing him as "selfless[]," "trustworthy and reliable," "tenacious work ethic," "one of the first ones to step up and volunteer," "passionate about his job," and "always willing to take on difficult jobs."[3] These same sentiments were shared by those that knew him outside of law enforcement as well, as a sampling of support letters from his family and friends shows.[4]

Without question John Balian defined public servant and stood as an example to other officers, to the community, and to his family. And then, for a short time in this otherwise exemplary life, John Balian stepped off the path he had chosen for himself—a path he had dreamed of as a young boy. John Balian—the public servant, the husband, the father, the brother, the neighbor, the friend—lost his way. In particular, he lost sight of the values that had guided him his entire life and that led him to become a police officer in the first place: a fierce desire to treat everyone—regardless of age, gender, religion, wealth, ethnicity, or race—with the same respect and dignity; the deep feeling of satisfaction and pride he experienced when helping others; the respect for law enforcement that he developed at a very young age; a strong religious conviction and devotion to family; and the example his own father had set when he brought his young family to the United States to escape religious persecution.

---

[3] These statements were taken from Mr. Balian's employee evaluations as a Glendale police officer. Copies of some of Mr. Balian's performance evaluations along with a sampling of commendations he received from the Glendale Police Department and the Montebello Police Department are attached to the Missakian Decl. as Exhibit C.

[4] *See* Missakian Decl., Ex. B (attaching letters of support).

The values that made John Balian a model police officer—and that his family, friends, and colleagues knew—will guide him again for the rest of his now very different life and ensure that he will never commit another offense. Although he will no doubt struggle to understand just how and where he went wrong, he feels ashamed and deeply remorseful of the choices he made. Yet, even though he has lost almost everything, he is not bitter. He eagerly looks forward to returning to his wife and children, who need him, and to the community he once protected as a law abiding, productive member of society. He understands that he will never experience the pride of wearing a badge again and for that he is truly sorry. But there are many ways to serve, and he is ready to do so, including speaking to police academy recruits about how he lost his way and, more importantly, how they can avoid his fate.

While Mr. Balian is prepared to accept the Court's just punishment, that punishment should not be driven by the more sensational claims contained in the government's original arrest affidavit and apparently repeated to the probation officer by the lead case agent. While the government's arrest affidavit made for great headlines—and led to the magistrate judge denying Mr. Balian bond—headlines should play no role in the Court's sentencing decision. Mr. Balian pleaded guilty to three admittedly serious offenses and his sentence should reflect those crimes, not crimes for which there is insufficient evidence.

Mr. Balian has served almost 10 months in solitary confinement (first in the SHU at MDC and now at another facility). Although he was placed in isolation for his own protection, no one can dispute that the time he has served has been far more severe than most would serve and the toll it has taken on his mental and physical health cannot be understated.

John Balian and his family have already been punished in ways that no other person in his shoes will ever experience or can even imagine. His reputation is ruined. His family's finances are ruined. His wife suffers from depression. His youngest boy age 12 suffers from ADD and has gone without care because the family has no health insurance and cannot afford treatment. His oldest boy was forced to leave college to go to work to help support his mother—oddly, in much the same way that Mr. Balian was forced to go to work at a young age when his own father was diagnosed with cancer. And his arrest in May 2018 came just a short time after his 25-year-old daughter died from an accidental drug overdose, taking him out of the house when his family needed him most. In truth, Mr. Balian has already been punished far beyond what would be minimally sufficient to further any legitimate sentencing goal and will continue to be punished for the rest of his life. Accordingly, Mr. Balian respectfully requests that the Court impose a sentence of 10 months time served with some amount of community service, which, as discussed below, is more than appropriate given the facts of the case.

## II.    § 3553(a) FACTORS

The federal sentencing statute asks the Court to tailor an individualized sentence that is "sufficient, but not greater than necessary" to comply with the purpose of 18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed, the Court shall consider –

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B)    to afford adequate deterrence to criminal conduct;
>> (C)    to protect the public from further crimes of the defendant; and

1

2

> (D)   to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

3

18 U.S.C. § 3553(a).

4

A minimally sufficient sentence balances considerations of punishment,

5

protection, and deterrence with the unique characteristics and history of the

6

defendant. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). To arrive

7

at such sentence, a court should begin by correctly calculating the applicable

8

Guideline range recognizing that the Guidelines are the "starting point and the

9

initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007)

10

(citation omitted). The court then "must consider the arguments of the parties and

11

the factors set forth in § 3553(a)" to arrive at the least punitive sentence that

12

achieves the goals of sentencing. *Peugh v. United States*, 133 S.Ct. 2072, 2080

13

(2013). The court may rely on attributes of the defendant that make him more

14

likely to become "a productive, non-threatening member of free society" when

15

determining the least punitive sentence. *See United States v. Autery*, 555 F.3d 864,

16

874 (9th Cir. 2009)  (upholding probation only sentence for first time offender with

17

a career as a police officer in possession of child pornography).

18

John Balian's case stands out in several important respects: his exceptional

19

record as a police officer and public servant; his genuine contrition for the

20

uncharacteristic errors in judgment that he made; and his deep remorse and respect

21

for the law,

22

### A.   History and characteristics of defendant

23

24

For many who stand in Mr. Balian's shoes their history and characteristics

25

amount to little more than passing considerations. For Mr. Balian, however, that

26

history is everything. It explains how he came to devote his life to public service.

27

And it is compelling testimony that the crimes for which he pleaded guilty

28

represented a radical departure from the life he had led—and the life he will lead in the future.

The fact that John Balian devoted much of his life to public service will not come as a surprise to anyone who learns his background, which is unique. Born in Turkey, Mr. Balian and his family like many others of Armenian ancestry fled after the military coup in 1978 to avoid persecution by the Muslim regime—a regime that had a long history of mistreating Armenians and other Christians. While this would constitute Mr. Balian's first experience with prejudice and injustice, it would not constitute his last.

At age 6, Mr. Balian moved with his family to France before moving about a year later to the United States in 1979. The family settled in Orange County—a decision that would further shape Mr. Balian's character and path. Mr. Balian did not speak English and looked different from most of the other children in his public school. As a result, other kids shunned him and his brother. There were fights. And there was name calling. "Sand [n-word]" and "camel jockey" were some of the grossly offensive ethnic slurs that Mr. Balian and his brother Mark lived with almost daily.

Living through this experience could have led to resentment and disaffection. But to Mr. Balian, although painful, these early childhood experiences instilled in him a fierce sense of fairness and the belief that everyone deserves respect—an outlook that years later he would put into practice as a police officer. As one of his Glendale Police Department ("GPD") supervisors observed, "I have seen John's compassionate side . . . as he ensures that all parties involved in the investigation are treated with dignity and respect."[5] Similarly, "John is aware of the diversity in our City and treats all citizens fairly."[6]

---

[5] *See* Missakian Decl., Ex. C, at 32.

[6] *Id.* at 38.

At age 13, John's life changed again and this time even more dramatically when doctors diagnosed his father with a malignant brain tumor. Suddenly, John's father, the family's sole means of support, could not work. As the eldest, John went to work along with his mother at the family's gas station while his father underwent treatment. Mr. Balian cleaned toilets. He pumped gas. He did whatever they needed him to do while at the same time going to school. Looking back on those early years, as Mr. Balian puts it, he had to "grow up fast." But he did not complain. And like his other life's experiences, this too pointed him toward public service and would become a deeply ingrained trait of his character. Years later, another GPD supervisor remarked that "John accepts all assignments []regardless of how undesirable the assignment might be"—just as he had done as a young boy.[7]

John's father recovered from the brain tumor, but the good news was short lived and two years later the family received the devastating news that John's father had stomach cancer, an illness that would eventually take his life in 2017 just a short time before Mr. Balian's daughter would die from what was deemed an accidental overdose. During this period—when John was about 16—he drove his father to chemotherapy and attended school while his mother worked at a local dry cleaner. Eventually, John began working at a small restaurant the family had purchased. Unknown to John, the restaurant—where he bussed tables, washed dishes, took out the trash, and cleaned the bathrooms—would become the most important step on his path to becoming a police officer.

As it turned out, a lot of police officers ate at the restaurant where John worked. These officers treated John with respect—respect that he had a hard time finding among his peers in Orange County. Not surprisingly, as John's own father's health deteriorated these police officers became part of a surrogate family

---

[7] *Id*. at 35.

and he looked up to them with admiration. The officers, in turn, took John under their wing. He went on numerous ride-alongs and saw the life of a police officer up close and loved what he saw. The die of John's future was all but cast.

John worked at the restaurant while attending school and continued to do so even after graduating high school. Although by that point he had his heart set on becoming a police officer, he needed to work fulltime to support the family. Eventually, when his younger brother Mark graduated high school and could shoulder more of the family's financial burden, John at the age of 23 enrolled in the Rio Hondo Police Academy. Most people who attend police academies attend for free. Mr. Balian, however, did not have a job waiting for him but felt so committed to law enforcement that he enrolled and paid his own tuition with the help of his family. He attended the academy while working weekends at the restaurant and eventually graduated.

In 1996, Mr. Balian's dream of becoming a police officer finally came true when the Montebello Police Department ("MPD") hired him. He thrived in Montebello and earned the respect of his fellow officers and the community. In fact, by the time he left the force to move to Glendale Mr. Balian had become a trusted training officer for new hires. Mr. Balian's performance with MPD was nothing less than stellar and showed the highest level of commitment to public safety and to his fellow officers. The then-chief of police, Steve Simonian, wrote to Mr. Balian: "John . . . You make me proud! Keep up this pace & you'll take my place."[8] Mr. Balian received many commendations while with MPD, some of which are included with this submission, and was selected as Officer of the Year.

Although it would be difficult to describe in detail all of the many commendations Mr. Balian received, it is worth describing a few. Not because they all tell stories of Mr. Balian's heroism, although some do, but because together

---

[8] Missakian Decl., Ex. C, at 17.

they tell the story of Mr. Balian's true character. For example, in one instance, while an MPD officer Mr. Balian was called out to handle a complaint about a person going door-to-door intimidating the residents to give him money. While the call might have appeared "penny ante" to most, Mr. Balian treated it and the residents with professionalism and concern. In commending him, the chief said "[i]t is easy for law enforcement personnel to look upon a[n] incident as a routine matter and be unaware of how traumatic the situation can be to a private citizen. Your professionalism and sensitivity in handling the incident was very much appreciated by the Neighborhood Watch group and reflects well upon our entire agency."[9] This is just one of many, many small examples of Mr. Balian going the extra mile to serve the community.

Mr. Balian also went the extra mile to serve his fellow officers. In 1997, another MPD officer had stopped a vehicle that had been reported stolen. Because the driver/thief was still in the car and could be armed, it automatically became a high-risk stop and the officer radioed for help. At the time, Mr. Balian was four blocks away where his vehicle was stuck at a carwash. Rather than assume someone else would help, Mr. Balian left his car and sprinted the four city blocks. In fact, he was the first to arrive. The chief's commendation said he was "not surprised" and commended Mr. Balian for his "unselfish efforts and dedication in the performance of your duties." It was that same dedication that led Mr. Balian's supervisor in nominating him to be Employee of the Month to say that he was "always willing to help [his] fellow officers in anyway [he] can . . . [and that his] level of performance is an example for others to follow."

In another instance, one night about 2 a.m. after Mr. Balian had finished his shift and was driving home to his family on the 5 freeway he spotted a car stopped

---

[9] Missakian Decl., Ex. C, at 21. Mr. Balian estimates that while at MPD he received about 30 to 35 commendations. According to the MPD, however, Mr. Balian's records have been destroyed and so he was only able to locate a small number of commendations that he received.

on the freeway ahead—not on the shoulder but in the number one (or fast) lane itself. As other drivers swerved to avoid hitting the stopped car, without hesitating Mr. Balian pulled over to help. He soon realized the car's driver was still behind the wheel but sitting motionless and unresponsive. At first, Mr. Balian grabbed his flashlight and walked onto the freeway trying to stop all lanes of traffic. One person with a flashlight, however, could not do it. Instead, Mr. Balian pulled the driver out and dragged him to the side of the road. Within seconds a car smashed into the rear of the stopped car. Without this selfless act, one life could have been lost and others changed forever. If asked about the freeway incident, Mr. Balian downplays it, simply saying that being a police officer was just "a way of life."

When he left Montebello to take a job in Glendale at least one person quipped that the city should fly the flags at half-staff. Although his later years in Glendale were marred by intra-department conflict as a result of his believing that because of his Armenian ancestry he was being treated differently,[10] his abiding commitment to public service shined through there as well. Just a few of the comments from his reviews over the years paint a picture of John Balian the public servant:

- "John is very responsive to citizens. John demands services to be provided in a manner that is acceptable, prudent and prompt. He likens to a familiar saying "Do unto others as you would expect others to do unto you."[11]

- "John has a strong sense of pride for the Glendale Police Department and the position that he holds. He is a tenured officer who is

---

[10] This feeling was so heartfelt that Mr. Balian and several other officers of Armenian ancestry sued the City of Glendale for discrimination, a suit that Mr. Balian and the city eventually settled.

[11] Missakian Decl., Ex. C, at 39.

trustworthy and reliable. John is always upbeat and brings a sense of high morale, good teamwork and cohesiveness to the unit."[12]

- "John accepts new assignments enthusiastically and doesn't complain. John is one of the first ones to step up and volunteer for assignments by the sergeants."[13]

- "John's friendly and professional demeanor, coupled with his tenacious work ethic, enables him to be well liked by his peers and supervisors."[14]

- John is a hard worker and is passionate about his job. John has conducted some great investigations, which has [sic] resulted in large seizures and numerous arrests. I would encourage John to continue his path of improvement and continue to exceed the standards of the Glendale Police Department."[15]

- John accepts all assignments irregardless [sic] of how undesirable the assignment might be. I've asked John to work undercover on prostitution stings and also to be the case agent. He does not hesitate to do either. On several occasions it has been necessary to transport arrested suspects to the jail after a long day of surveillance. John 'steps up' and takes the transportation assignments without hesitation."[16]

- "John understands that completing tasks is an important part of teamwork. He makes himself available to assist his peers with what

---

[12] Missakian Decl., Ex. C, at 29.

[13] Missakian Decl., Ex. C, at 31.

[14] Missakian Decl., Ex. C, at 32.

[15] Missakian Decl., Ex. C, at 33.

[16] Missakian Decl., Ex. C, at 35.

DEFENDANT'S SENTENCING POSITION PAPER

ever [sic] they need and is always willing to take on the difficult jobs."[17]

The GPD eventually promoted Mr. Balian to become the department's public information officer, in essence becoming the face and voice of the police force in a very diverse city. Just as he had done as a beat cop, Mr. Balian dedicated himself to the new role.

Just as he had done as an officer for the MPD, Mr. Balian went the extra mile with the GPD as well. For example, Mr. Balian was commended by one of his sergeants for taking the time to help a man who he found living out of his car. Rather than arresting the man or letting him become someone else's problem by forcing him to move to another area or city, Mr. Balian took an interest in the man and over time gained his confidence. Eventually, Mr. Balian convinced the man to get help and directed him to the community services he needed. As a result of Mr. Balian's efforts—efforts that certainly fell outside his job description—the man in the car got his life back on track.

In another instance, Mr. Balian noticed a man lying on the street who appeared to be in trouble. His reflex, as before, was to stop and see if he could help—and this time the man truly needed help. Mr. Balian found him unconscious and, he learned later, in a coma. Mr. Balian arranged to have the man taken to the hospital where he stayed to meet with the person's family. As it turned out, the man's brother was a high-level official in the City of Glendale. The hospital wanted the brother to let the man die but Mr. Balian encouraged him to wait. Eventually, and miraculously, the man survived but the accident left him permanently disabled and with severe brain injuries.[18]

The qualities and dedication that Mr. Balian showed as a police officer—the deep-seated desire to serve others—defined Mr. Balian even when he was not

---

[17] Missakian Decl., Ex. C, at 36.

[18] Missakian Decl., Ex. C, at 25.

wearing a uniform. Mr. Balian's next door neighbor described this quality in her letter of support to Court:

> One time, John was in his driveway and I was in mine, struggling to get a large heavy item out of the back of my SUV. I wasn't quite sure how I was going to manage without damaging my car. I didn't even ask John for help and out of nowhere he just appeared offering to help me. Another time, while my husband was at work, I was in a jam and needed to get some furniture out in my driveway for a donation pick up. I called next door to see if any of his boys might be available to lend a hand, and within a minute, John was at my door, (in his slippers!) ready to help. ***Why do I keep mentioning slippers? Because I think its symbolic of the kind of guy John is. He could have stopped and taken a minute to slip on sneakers or a button down shirt, but he values helping people and being dependable more than superficial social norms.***[19]

In other words, Mr. Balian's reflex—whether people were looking or not—has been to serve others.

In another instance, Mr. Balian received a call from an elderly woman. At that point, Mr. Balian had become the face of the police department in Glendale and it was not unusual for residents to contact him directly. This time, however, the woman just needed help getting to the doctor. While most officers would not have bothered to do more than direct the woman to the nearest bus stop or taxi service, Mr. Balian was different. He got into his car and he took the woman to the doctor himself. When Mr. Balian said that being a police officer was a way of life, he meant it was a way of life in service to others—and he lived that life every day.

As this short summary of Mr. Balian's life illustrates, for the bulk of that life he was a true example to other officers, the community, and to his friends and family. And then, for a short time, he was not. To this day, Mr. Balian struggles to understand where he went wrong. But as Mr. Balian will explain to the Court, he makes no excuses for his actions and blames no one but himself. Yet, when measured against his entire life, Mr. Balian's grave errors in judgment and the harm he caused pale in comparison to his years as a dedicated, honest,

---

[19] Missakian Decl., Ex. B, at 12 (attaching letter from Kim Colton) (emphasis added).

hardworking, selfless public servant. Those characteristics define John Balian; those characteristics will guide him and ensure he never commits another crime again.

**B.    Nature and circumstances of the offense**

With regard to the bribery count, it bears mentioning that Mr. Balian could have tried to locate the individual suspected of the robbery on his own. In other words, he did not need the U.S. Marshall's service to access the protected data base; he had access in his own right. In fact, it appears that he ran a search in the database for the same information in February 2017. Moreover, although Mr. Balian does not seek to downplay the seriousness of his conduct, this case differs from the typical corruption case where the bribe payer obtains some benefit to which he would not otherwise be entitled. Here, the victim of the robbery had every right to insist that law enforcement use its resources to catch the suspect. Obviously, Mr. Balian went very wrong when he accepted $2,000 for doing his job and for that he is truly sorry.

**C.    Seriousness of the offense, just punishment, respect for the law**

Mr. Balian has clearly demonstrated his respect for the law by the almost-immediate decision to plead guilty and accept responsibility for actions.

Against this backdrop and the backdrop of the unique ways that Mr. Balian has already been punished and will continue to be punished—loss of his reputation, financial ruin, loss of his job, and loss of his and his family's peace of mind—a sentence of 10 months time served is more than enough to advance the goals of sentencing, is consistent with a reasonable application of the Guidelines, and represents a just punishment.

## III.   GUIDELINES CALCULATION

Mr. Balian respectfully requests that the Court: (1) reject the Presentence Report's Guidelines calculation and sentencing recommendation and any enhancement the government may seek; (2) accept the plea agreement's calculation of a total offense level 18; (3) decrease that offense level by 3 levels under USSG § 3E1.1;

Mr. Balian respectfully requests that the Court sentence him to time served and community service.

### A.   **Plea Agreement**

The plea agreement calculates Mr. Balian's offense level for Count 1 at 16, Count 2 at 14, and Count 3 at 6 and provides the government will request a 3-level reduction for acceptance of responsibility if available. Under the multi-count rules in USSG § 3D1.1, both the government and Mr. Balian calculate his total offense level, after the 3-level reduction for acceptance of responsibility, as 15 with a range of 18 to 24 months in Criminal History Category I.

### B.   **Presentence Report**

The probation department calculates Mr. Balian's total offense level at 16 after 3 levels off for acceptance resulting in a sentencing range of 21 to 27 months. Probation arrives at this higher offense level by using a different offense level for Count 3, which in turn leads to a different grouping calculation, and by adding a 2-level enhancement for abuse of a position of trust on Count 2. Mr. Balian disputes both the grouping calculation and the 2-level enhancement, as discussed below and in his concurrently-filed objections to the presentence report ("PSR"). The probation department then recommends a sentence at the high end of the 21 to 27-month range.

The probation department's high-end recommendation appears to be based on a belief that Mr. Balian is a bigger offender than the crimes to which he pleaded guilty suggest. As the probation officer puts it, the three crimes to which he pleaded guilty "do not capture the true extent of Balian's criminality." (Sentencing Recommendation Letter, at 5.) This conclusion, however, comes not from a careful weighing of the evidence but, rather, from statements made by the lead case agent. That case agent, however, appears to harbor some personal animus toward Mr. Balian and has, in fact, stated that he wants to see Mr. Balian "stay in custody as long as possible[.]"[20]

The PSR refers to this other alleged conduct under the heading "offense behavior not part of relevant conduct." (PSR, at 10.) For example, it mentions Mr. Balian's alleged participation in the theft of "over a dozen high-value cars" and also alleges that he gave an individual identified only as "J.S. . . . names of people to extort." (PSR, at ¶¶ 51 and 52.) Similarly, the probation department's recommendation letter states as a fact that Mr. Balian "*participated in criminal activity on a regular basis*" and he was akin to "*an active gang member*"— conclusions that the probation officer failed to explain or support.

It is possible that the probation officer relied on the government's original arrest warrant affidavit—which paints a damning yet one-sided picture of Mr. Balian. A careful reading of that affidavit, however, reveals several problems. As discussed below, those problems cast serious doubt on some of the more serious allegations in the affidavit and should cause the Court to hesitate before relying on the allegations in arriving at Mr. Balian's sentence.

As just one example, the arrest affidavit, which is signed by Agent Hyland, states that Mr. Balian took part in extortion of an auto body shop in Glendale called "OK Auto Body"—an obviously serious accusation and one the magistrate

---

[20] *See* Missakian Decl., Ex. E (attaching emails from Agent Michael Hyland and others).

judge relied on in denying Mr. Balian bond. According to the Affidavit, "CHS-3" claimed that "Balian directed CHS-3 to go to '[O.K.'s] Auto Body' and just 'make up reasons to hit up the guy for money."[21] Agent Hyland explained that he took that statement found an LAPD report involving a claimed extortion of O.K. Auto Body that occurred between December 2014 and January 2015. Agent Hyland put two and two together—CHS-3's claim and the LAPD report—and concluded that CHS-3 was telling the truth about Mr. Balian.

CHS-3's story, however, had one big problem: According to the Affidavit that Agent Hyland signed, CHS-3 *did not meet Mr. Balian until mid-August 2016 at the earliest*.[22] As explained in the Affidavit, CHS-3 told officials that he did not meet Balian until after his cohort "Trigger got busted." According to the Affidavit, "Trigger" (the moniker of CHS-3's cohort "J.M.") was arrested on August 16, 2016. In other words, CHS-3's story was demonstrably false based on the very statements Agent Hyland himself stated were true in the Affidavit.

As another example, and possibly the most troubling allegation in the Affidavit, is that Mr. Balian orchestrated a drive-by shooting in order to "scare" someone and then hid the gun used in the crime—another allegation the magistrate judge no doubt relied on in denying Mr. Balian bond. According to Agent Hyland, CHS-3—the same informant who claimed Mr. Balian directed him to extort OK Body Shop years before he had met him—claimed that "Balian offered CHS-3 and J.M. $100,000 to scare an individual."[23] In the very next sentence, however, Agent Hyland added that CHS-3 for some unknown reason "was unable to participate [in

---

[21] *See* Balian Arrest Warrant Affidavit ("Affidavit"), at ¶¶ 74 and 75.

[22] *See id.* at ¶ 66. CHS-3 stated that he did not meet Balian until after "Trigger got busted" which according to the Affidavit occurred on August 16, 2016. *See id.* at n.20.

[23] Affidavit, at ¶ 79.

the shooting] but provided his grey Honda pilot to J.M" so that J.M. could do the shooting on his own.[24]

According to the Affidavit, J.M. went through with the shooting and at one point believed he had not only shot at but had actually killed the person he had only intended to scare. The Affidavit goes on to state that "CHS-3 believes that J.M. called Balian for help, because Balian and J.M. subsequently drove to CHS-3's residence, at which time *CHS-3 gave the gun to Balian*."[25] Armed with this story, just as they had done with the OK Body Shop allegations, the agents went in search of a crime and found that on July 14, 2016 a shooting occurred in the area that CHS-3 described. They also found that Balian's cell phone had pinged a tower in the area at 10:37 p.m. on July 14, 2016, which Mr. Balian explained was several hours after the alleged shooting.[26]

While Mr. Balian has discussed this incident with the government and admitted that he knew J.M. and gave him a ride that night, the claim that Mr. Balian orchestrated the shooting falls apart much like the alleged extortion plot described above. Again, according to the government's own affidavit signed by Agent Hyland, CHS-3 did not meet Mr. Balian for the first time until mid-August 2016. As such, it would not have been impossible for "CHS-3 [to give] the gun to Balian" a month earlier. While one inconsistency in a statement might be excused, CHS-3 had multiple critical details about the most serious allegations wrong. That combined with his obvious motive to lie, casts serious doubt on the claims.[27]

---

[24] Id. Putting aside the inherent implausibility of this entire story, to evaluate the truthfulness of CHS-3's statements it would have been critical to know exactly why he was "unable to participate" in the shooting, especially with $100,000 on the line. That information, however, is left out of the affidavit and the reader is left to guess.

[25] Affidavit, at ¶ 80. There is no explanation in the Affidavit about how CHS-3, who was unable to participate in the shooting, obtained the gun in the first place.

[26] Id. at ¶ 84.

[27] At the bond reconsideration hearing where Mr. Balian's lawyer pointed out these and other inconsistencies to the magistrate judge, the government suggested that CHS-3 was not lying but possibly just "confused" about the dates. See Missakian Decl., Ex. D, at 9 (attaching

Mr. Balian adamantly denies these and the other more salacious allegations in the Affidavit and, it now appears, that were communicated to the probation officer. Those claims are based solely on the uncorroborated statements of three as-of-yet unidentified informants—whose claims as shown above should be viewed with deep suspicion. To the extent the Court is inclined to rely on the claims, however, either to determine Mr. Balian's sentence or to grant or deny a departure, *see* USSG § 1B1.4, Mr. Balian respectfully requests an opportunity to test the allegations at an evidentiary hearing. *See* Fed. Rule of Crim. Proc. Rule 32(i)(2) and (3). Any other course would be to impose a sentence based on information that even on its face falls well below the barest standards of proof and that the government has admitted is at best confused and at worst dishonest.

With regard to the 2-level enhancement for abuse of a position of trust, the enhancement does not apply simply because Mr. Balian was a police officer, as the PSR seems to suggest.[28] *See United States v. Harrington*, 82 F.3d 83, 88 (5th Cir. 1996) ("merely having the position of public or private trust is not sufficient to warrant an increase under § 3B1.3"); *United States v. Gould*, 983 F.2d 92, 94 (7th Cir. 1993) (Status as "police officer cannot, in and of itself, trigger the application of section 3B1.3."); *United States v. Rehal*, 940 F.2d 1, 5 (1st Cir. 1991) (fact defendant is a police officer does not in and of itself trigger application of § 3B1.3). As one court explained, "[w]hile it may be said that all police officers occupy positions of trust . . . the inquiry does not end there. Police officers are not afforded the same trust with regard to all matters; with respect to certain matters, police officers may occupy positions of special trust." *United States v. Pedersen*, 3 F.3d 1468, 1471 (11th Cir., 1993).

---

copy of relevant portions of transcript from two bond reconsideration hearings). It is also equally plausible that CHS-3 was simply making it all up. In either case, the information is not sufficiently reliable to use in making a sentencing decision.

[28] The 2-level enhancement the PSR applies to Count 3 is ultimately irrelevant if the Court rejects the PSR's calculations for Count 3.

Mr. Balian did not "abuse[] [his] position . . . in a manner that significantly facilitated commission . . . of the offense" of obstruction of justice. *See United States v. Foreman*, 926 F.2d 792, 797 (9th Cir., 1991) ("Still, it must be conceded that section 3B1.3 applies to offenders who abuse positions of public trust; not merely to those who occupy such positions or even to those who use such positions.") (Reinhardt, J., dissenting) (emphasis added). In fact, Mr. Balian did not abuse any position at all. *Cf. Pedersen*, 3 F.3d at 1472 (officer entrusted with restricted computer access that he misused). Rather, as Mr. Balian explained to the probation officer, he inadvertently overheard a discussion regarding the arrest of a person he did not even know and passed the information along.

While Mr. Balian readily concedes that doing so was wrong, he did not abuse his position as a police officer in a way that significantly facilitated the conduct. In fact, it was not his position as a police officer that enabled him to commit the offense at all. Any employee of the City of Glendale—whether a police officer, a record clerk, or a custodian—who happened to be in the hallway at the right time could have overheard the same information. Simply being "in the building," however, is not enough. *Cf. United States v. Long*, 122 F.3d 1360 (11th Cir. 1997) (rejecting government's blanket argument that "enhancement for an abuse of a position of trust would apply to any Bureau of Prisons employee who brought cocaine into the prison") *and United States v. Reccko*, 151 F.3d 29 (1st Cir. 1998) (rejecting application to police department receptionist who passed along information). *Cf.* USSG § 3B1.3 Application Note 1 (explaining that "embezzlement or theft by an ordinary bank teller or hotel clerk" does not qualify for the enhancement suggesting that access alone is not sufficient).

Finally, the 2-level enhancement is inappropriate because it is, in essence, already included in the base offense level. The alleged abuse of trust—*i.e.,* the act of passing along the overheard information—is the same conduct that forms the basis for the obstruction charge where the offense was, again, the act of passing

along the information he overheard. As the section states, "[t]his adjustment may not be employed if an abuse of trust . . . is included in the base offense level[.]" USSG § 3B1.3. *See also United States v. Claymore*, 978 F.2d 421 (8th Cir. 1992) ("If an abuse of trust is so central to the crime that the abuse would be included in the base offense level, the increase under § 3B1.3 is not available.") (citing *United States v. Lange*, 918 F.2d 707, 708-09 (8th Cir. 1990). Here, the alleged abuse is not only "central to the crime" for which Mr. Balian pleaded guilty, it was the crime.

The probation officer also miscalculated how the Court should treat the three counts to which Mr. Balian pleaded guilty under the multi-count grouping rules. Rather than using USSG § 2B1.1 for Count 3, as the government and Mr. Balian agreed, the probation officer used USSG § 2J1.1 relating to obstruction of justice. PSR at ¶¶ 36 and 37. In doing so, the probation department clearly double counted and thereby miscalculated the total offense level for Count 3 as 14 instead of 6 as agreed upon by the parties. The higher offense level, in turn, that led to an additional point under USSG § 3D1.4(a), a total offense level 19, and a sentencing range after 3 levels off for acceptance of 20 to 27 months.

Although the PSR does not explain its use of USSG § 2J1.2, it does reference § 2B1.1(c)(3) suggesting the probation officer believed "the conduct set forth in the count of conviction establishes [the] offense" of obstruction of justice. Nowhere, however, does the probation officer explain how the conduct to which Mr. Balian pleaded guilty in Count 3 establishes a violation of 18 U.S.C. § 1512(c)(2). In fact, the conduct does not constitute such an offense because Mr. Balian's statements were not intended to "corruptly . . . obstruct, influence, or impede any official proceeding." 18 U.S.C. § 1512(c)(2).

At worst, Mr. Balian made false statements to law enforcement to downplay his connections to certain individuals. That is not obstruction. That point becomes even clearer when one considers the obstruction of justice enhancement in USSG

§ 3C1.1. Application Note 5 to that section states that "making false statements, not under oath, to law enforcement officers" does not qualify as obstruction. The only exception is contained in 4(G) where the person made "a materially false statement . . . that significantly obstructed or impeded the official investigation . . . of the instant offense[.]" Obviously, that exception would not apply here because the "instant offense" and the allegedly obstructive conduct are the same.

### C.    A 1-level departure is warranted under § 5K2.0(c)

Section 5K1.0(c) allows the Court to depart downward based on a combination of two or more offender characteristics where each characteristic is "present to a substantial degree" and taken together "make the case an exceptional one." USSG § 5K2.0(c)(1) and (2)(A). Although such departures "should occur extremely rarely and only in exceptional cases," this case presents just such an exceptional case. USSG § 5K2.0 Application note 3(C).

### 1.    § 5H1.6—Family ties and responsibilities

John Balian is fortunate. When he leaves custody he will have the support of a loving and devoted family to watch over him and guide him as they rebuild their lives together, as the letters of support from his family show. His wife, his brother, his sister, and his mother, who all live within a short distance of each other, have supported Mr. Balian throughout this ordeal and no doubt will watch over him going forward. Mr. Balian's brother and best friend explained the support that Mr. Balian will get in his heartfelt letter or support:

> [John] is anxious to begin rebuilding his life and myself, along with the rest of his family members are eager to assist him and encourage him in any way just as he did for us many years ago. We are ready for the new journey ahead. I don't anticipate it being easy, but my family has continually displayed undeterred resilience and together we will help him become a productive member of society once again.  My brother John is a good person with a good heart. He just got derailed temporarily and is ready to get back on track.[29]

---

[29] Missakian Decl., Ex. B, at 9.

As important as the support of Mr. Balian's family will be, support is a two-way street and Mr. Balian needs to return home for his family, who have already suffered mightily for the errors he made. That is especially true now as the entire family struggles to recover from the death of their daughter. In February 2018, John's adopted daughter, who he raised from 1-month old, died from what authorities claimed was an accidental drug overdose. Mr. Balian and his wife Krista received the "death notice" in the middle of the night and, needless to say, have been devastated ever since. Through his own unspeakable grief, Mr. Balian was called on yet again to be strong for his family, much as he had done virtually his entire life. As one very supportive neighbor describes the daughter's funeral:

> Last year, when John's daughter Lexy died, my husband and I attended the funeral. It was a hard and sad day for everyone. The chapel was at full capacity. We sat in the back. John's wife Krista's cries were heart wrenching. One who has not experienced the loss of a child cannot imagine the despair John and Krista have had to endure. What stands out in my mind most about that day is the sight of John consoling his wife Krista; the expression of love and service to his family John displayed by hugging and holding them all, despite his own grief. It was so sad and beautiful at the same time.[30]

That same neighbor said of Mr. Balian, "[n]ot only is [he] not a danger to society, he is an asset to our neighborhood and we need him back."[31] Yet, just a few months later in May 2018, the government arrested Mr. Balian and took him away from his family when they needed him most.

Some will find it easy to dismiss the pain Mr. Balian's innocent family has suffered by saying he should have more carefully considered the consequences of his actions. But the extraordinary toll confinement has caused and will continue to cause if Mr. Balian remains in custody simply cannot be ignored. *See* USSG § 5H1.6; *see also United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000) (within

---

[30] Missakian Decl., Ex. B, at 12.

[31] *Id.*

district court's discretion to depart downward 4 levels for extraordinary family circumstances "based on the fact that there is an 8 year-old son who's lost a father and would be losing a mother for a substantial period of time"). Here, the toll Mr. Balian's absence has caused is already far more than substantial and easily within the standards set forth in USSG § 5H1.6.[32]

In particular, Mr. Balian's incarceration has already caused "a substantial, direct, and specific loss of . . . essential financial support, to defendant's family." For example, because the family does not have enough money it had to give up grief counseling, leaving Mr. Balian's wife and young son alone to cope with their daughter's death. Just as troubling, the family had to stop treatment for Mr. Balian's 12-year-old son's ADD because they lost their health insurance and cannot afford the treatment on their own—leaving the boy to fall behind in school.

The financial hardship has also taken its toll on Mr. Balian's oldest son Michael, who was forced to leave school to work at Trader Joe's to help support the family. But just as Mr. Balian had to work as a young boy when his father became ill, Michael has done so generously and without bitterness—just as his father before him. As his son explained, his "father's absence has been a great

---

[32] § 5H1.6 gives a list of circumstances that must exist to justify a departure under the section, including:

(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv) The departure effectively will address the loss of caretaking or financial support.

hardship on my family" and that he has been forced to take on "the role of man of the house and as a twenty year old . . . it has been a lot of pressure." And even though the death of his sister and arrest of his father have been devastating, as he put it, "the only thing I can say keeping myself this strong is the remembrance of my father never giving up." He also added that "I feel my father did a great job preparing me for this moment in my life."[33]

---

[33] Missakian Decl., Ex. B, at 15.

### 2.    § 5H1.9—*Criminal activity for livelihood*

Mr. Balian will not need to depend on criminal activity for his livelihood after his release. Mr. Balian not only worked tirelessly as a police officer but at the same time started and ran other legitimate businesses to supplement his family's income. Those businesses included two pizza parlors and a gas station. Moreover, well before his arrest he had already begun planning for his life after retiring as a police officer by enrolling in the Union Institute & University to obtain his B.S. degree, which he received in June 2017.[36] In other words, John Balian had not devoted himself to preparing for a life of crime; he had devoted himself to preparing for a better life for himself and his family in the private sector. That degree alone is strong evidence of the life Mr. Balian had planned for himself and his family—and it was not a life that involved criminal activity.

### 3.    § 5H1.11—*Public service prior good works*

While community service and good works are not ordinarily relevant, in Mr. Balian's case they are the defining characteristic of his life and merit consideration. As one court put it so well:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great

---

[36] Missakian Decl., Ex. A, at 8.

> religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp.2d 506, 513 (S.D. N.Y., 2006). As described more fully in Section I above, Mr. Balian spent much of his life, starting at age 13, helping others in countless large and small ways. And it is not an exaggeration to say that without him, many lives would have turned out differently and, possibly, tragically. Those good works go well beyond the mere donation of time or money but include putting his own life and well-being on the line for his fellow man. His service was extraordinary and alone or together with the other characteristics discussed justifies a departure of some amount.

### 4. *Other factors*

As of March 8, 2019, Mr. Balian will have served almost 10 months in solitary confinement. The nature of that custody has been far more severe than most inmates will ever experience and alone warrants a downward departure. *See United States v. Williamson*, No. ED-CR-13-00021-JLQ (C.D.C.A. 2013) (*citing United States v. Carty*, 264 F.3d 191, 196 (9th Cir. 2001)) ("we hold today that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures."); *United States v. Austin*, 309 Fed. Appx. 573 (3rd Cir. 2009); *United States v. Roser*, 2013 WL 3014122 (6th Cir. 2013)); *see also United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) ("In effect [defendant] is arguing that the severity of a prison sentence has two dimensions: its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be. There is enough merit to the argument to allow a sentencing judge to take it into account[.]" *citing Koon v. United States*, 518 U.S. 81, 111-12, (1996)).

Each of the four characteristics discussed above exist to a substantial degree and taken together make this case exceptional. As such, Mr. Balian respectfully requests that the Court depart downward at least 1 level under USSG § 5K2.0(c).

DEFENDANT'S SENTENCING POSITION PAPER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## V.     CONCLUSION

Mr. Balian has devoted his life and career to the service of others. While he made serious errors in judgment, he is deeply remorseful and showed true

26
27
28

DEFENDANT'S SENTENCING POSITION PAPER

contrition by immediately taking responsibility for his actions. He is unlikely to commit another offense and he and his family have suffered far beyond anything necessary to serve the purposes of a just punishment. For all of the reasons discussed above, Mr. Balian respectfully requests that the Court impose a sentence of time served along with some amount of community service.

Dated: February 25, 2019                        Respectfully submitted,


                                                _____
                                                Craig H. Missakian
                                                Attorney for Defendant
                                                John Saro Balian