Craig H. Missakian (SBN 125202)
craig@cmlawpartners.com
Law Offices of Craig H. Missakian
116 Club Road
Pasadena, CA 91105
Phone: 818-802-9811

Attorney for Defendant
John Saro Balian

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN SARO BALIAN,<br><br>Defendant. | Case No.: CR 18-345-JFW<br><br>DEFENDANT JOHN SARO BALIAN'S RESPONSE TO GOVERNMENT'S POSITION RE SENTENCING<br><br>DATE: March 8, 2019<br>TIME: 8:30 a.m.<br>COURTROOM: 7A |

Defendant John Saro Balian, by and through his counsel of record, respectfully submits his response to the government's position re sentencing.

*[T]he guidance I always gave my prosecutors and the agents that I worked with during my tenure on the front lines of law enforcement were if we aren't prepared to prove our case beyond a reasonable doubt in court, then we have no business making allegations against American citizens.*

Deputy Attorney General Rod Rosenstein[1]

## I.   INTRODUCTION

The Deputy Attorney General's recent comments highlight a fundamental unfairness in the government's sentencing position. Rather than relying on facts to justify the harsh sentence it seeks, the government asks the Court to sentence Mr. Balian based on conjecture and the untested claims of a confidential informant it has yet to identify and who it concedes cannot be corroborated—let alone proven beyond the barest standard of proof. The headline-grabbing allegations that dot the government's brief—Mr. Balian "turn[ed] to a life of crime;" Mr. Balian "join[ed] forces with Armenian Organized Crime and the Mexican Mafia;" Mr. Balian "lived the life of a gang member"—are just that, allegations. While they may have been enough to convict Mr. Balian in the court of public opinion, law and fundamental fairness require more in determining a reasonable sentence.[2] Mr. Balian is deeply sorry for the offenses he committed and is eager to rebuild his life as a law abiding citizen. But he and his family have already been punished enough, and certainly well beyond anything that needed serve a legitimate purpose. As such, he respectfully requests that the Court reject the government's request and the probation officer's recommendation and, instead, sentence him to time served and community service.

---

[1] Deputy Attorney General Rod Rosenstein, Comments at the Center for Strategic and International Studies during program entitled Defending Rule of Law Norms: A Conversation with Rod Rosenstein (Feb. 25, 2019).

[2] *See generally* Robert Alan Semones, Note, *A Parade of Horribles: Uncharged Relevant Conduct, the Federal Prosecutorial Loophole, Tails Wagging Dogs in Federal Sentencing Law, and United States v. Fitch*, 46 U.C. DAVIS L. REV. 313 (2012).

DEFENDANT'S RESPONSE TO GOVERNMENT'S POSITION RE SENTENCING

## II.    DISCUSSION

### A.    <u>USSG § 3B1.3 is inapplicable to Count 1</u>

The PSR calculated a 2-level increase under USSG § 3B1.3 for Count 2 and the government seeks the same for Count 1. Both requests are without merit.[3] The fact that Mr. Balian worked as a police officer is insufficient on its own to justify a two-level enhancement under USSG § 3B1.3, as both the government and probation appear to assume. *See United States v. Harrington*, 82 F.3d 83, 88 (5th Cir. 1996) ("merely having the position of public or private trust is not sufficient to warrant an increase under § 3B1.3"). Moreover, Mr. Balian's status as a police officer is already accounted for in his Guidelines calculation under USSG § 2C1.1(a)(1), which uses a higher base offense level for public officials. *See* USSG § 3B1.3 ("This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.") and Application Note 6 ("Do not apply § 3B1.3 (Abuse of Position of Trust or Use of Special Skill")); see also *United States v. Solomon*, 766 F.3d 360, 367-68 (3rd Cir., 2014) (referring to Note 6 and explaining that "[t]his prohibition apparently accounts for the fact that § 2C1.1 already provides a 2–level increase if the defendant was a public official").

Even if Application Note 6 does not control, the government must still show the act of accessing the database "significantly facilitated" the offense to which Mr. Balian pleaded guilty. USSG § 3B1.3. The government has not, and cannot, make that showing because accessing the database played no part in the § 666(a)(1)(B) violation. The elements of that offense, as set forth in the plea agreement, are: (1) Defendant was an agent of the City of Glendale; (2) The City of Glendale received federal benefits in excess of $10,000 in a one-year period; (3) Defendant ***accepted or agreed to accept*** something of value from a person; (4)

---

[3] Mr. Balian addresses the merits of the PSR's recommendation in his sentencing position papers at 23-25.

1  Defendant *acted corruptly with the intent to be influenced or rewarded* in
2  connection with the business or transaction of the City of Glendale; and (5) The
3  value of the business or transaction to which the payment related was at least
4  $5,000. Plea Agreement, at 6 (emphasis added).

5       Mr. Balian's offense was the act of accepting or agreeing to accept money to
6  help locate a robbery suspect while employed as a Glendale police officer. Mr.
7  Balian could have accepted the money (or agreed to accept the money) without
8  having accessed the protected database, which is exactly what the government
9  alleged originally. In other words, and almost by definition, accessing the database
10 did not "facilitate" the offense. At most, accessing the database may have
11 constituted a *consequence* of the improper agreement. Without a connection, let
12 alone a "significant" connection, between the alleged abuse and the offense, the
13 enhancement does not apply. *See United States v. Burt*, 134 F.3d 997 (10th Cir.
14 1998) ("Without the requisite connection between the crime and Defendant's
15 special knowledge, the section 3B1.3 enhancement for use of a special skill cannot
16 be affirmed.")[4]

17      **B.    In their rush to vilify Mr. Balian, the government and probation**
18           **officer overstate key facts and get others completely wrong**

19      In one of the more troubling parts of the government's brief, it seeks to
20 justify a higher sentence because, it claims, Mr. Balian acted "in reckless disregard
21 for the safety of others" and "placed other officers at risk" when he tipped off a
22 gang member about his pending arrest. (Government's Position re Sentencing
23 ("Government's Position"), at 7 and 11.) The government put it this way:

24      ***Luckily***, the shotcaller ***decided*** to flee, as opposed to stand and fight.
        The probation officer's concern that the shotcaller could have injured

---

26      [4] Nor has the government given the Court a timeline of events or explained why Mr.
27 Balian accessed the database. As such, it is impossible to say whether Mr. Balian's accessing the
   database in early February 2017 followed the acceptance or agreement to accept the money or
28 whether Mr. Balian did the search in the ordinary course of his job as a police officer after being
   contacted by the robbery victim.

or killed officers *if he had decided to lay and wait* is not baseless speculation. Indeed, several California police officers have been shot while attempting to arrest suspects in recent years.

(Government's Position, at 7 (emphasis added). To use the tragic—and completely unrelated—shootings of other police officers to increase Mr. Balian's sentence is deeply unfair and misleading. As tragic as the other shootings are, the suggestion that Mr. Balian *in this instance* acted *knowing* that he might be sending his fellow officer's into an ambush is absolutely untrue.[5]

No one—and certainly not Mr. Balian—seeks to justify what he did, but as he explained to the probation officer he believed that the individual would flee, which is exactly what occurred. While that hardly excuses the conduct, it is very different than the picture the government paints when it suggests the individual first considered an armed standoff with arresting officers and then through good fortune alone changed his mind and fled. There is no evidence that an actual risk of harm existed—let alone a risk that Mr. Balian knew and ignored. As such, it is not accurate, legally or factually, to describe the conduct as recklessly endangering the lives of others. *See United States v. Gardenhire*, 784 F.3d 1277 (9th Cir., 2015) (rejecting upward departure based on reckless endangerment where the "record is devoid of evidence, let alone clear and convincing evidence, that [defendant] was aware of the risk created by his conduct").

The government next points out that Mr. Balian made cash deposits of $146,653.00 into two bank accounts. It then adds that one of the accounts was a

---

[5] The term "reckless disregard" has an established legal meaning. The Supreme Court has made plain that criminal recklessness generally requires that "a person disregards a risk of harm *of which he is aware*." *United States v. Rodriguez*, 880 F.3d 1151, 1159-60 (9th Cir., 2018) (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (*citing, inter alia,* Model Penal Code § 2.02(2)(c) (emphasis added)). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. In other words, the standard requires that the defendant "was subjectively aware of the risk." *Id*. at 829. *See also* USSG § 2A1.4 ("'Reckless' means a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation.")

DEFENDANT'S RESPONSE TO GOVERNMENT'S POSITION RE SENTENCING

"joint account with defendant's girlfriend, as opposed to the account he used to support his wife and children." *Id*. at 8. The reference to Mr. Balian's wife and children in the same sentence as his former girlfriend is a gratuitous (and unseemly) attempt to destroy his reputation, to divide his family at a time when he needs them most, and, most obviously, to prejudice the Court against him. Mr. Balian does not have a girlfriend, as the government well knows, and what occurs in the privacy of the Balian household is nobody's business—and it certainly has no place in this sentencing.

Moreover, it is unclear why the government mentioned the cash deposits in the first place other than to imply that Mr. Balian obtained the cash from criminal activity involving "Armenian Organized Crime and the Mexican Mafia." It makes that suggestion, however, while at the same time stating that "it remains unclear how much defendant profited from his relationships with Armenian Organized Crime and the Mexican Mafia." *Id.* In other words, it appears that significant questions remain about the money and where it came from. Without definitive answers to those questions, the cash deposits and the accompanying spreadsheet prove little about the nature of Mr. Balian's alleged activities or connections with the two groups.

The government next states that Mr. Balian "attempted to evade law enforcement's efforts to impose a financial punishment" when he "quick-deeded [sic] his home after he was interviewed by the FBI for a fourth time and shortly before his arrest." (Government's Position, at 8.) As support for this accusation that Mr. Balian fraudulently transferred assets, the government cites paragraph 73(b) of the PSR, which states in part that "[a] quit claim deed [sic], filing number 2018-0085717, was filed in San Bernardino County Superior Court on March 9, 2018." (PSR, at ¶ 73(b).) There is, however, one basic problem with the government's and probation officer's accusation: It never happened.

Mr,. Balian's home, as the attached property report shows, was as of Monday, March 4, 2019 **still in Mr. Balian's own name**. (*See* Declaration of Craig H. Missakian, Ex. A.) In its rush to smear Mr. Balian, it appears that neither the government and probation officer read the quitclaim deed—what they rely on as evidence of a scheme to frustrate law enforcement. If they had read it, they would have seen that it is for a property in **San Bernardino County**. Mr. Balian's house is in **Orange County**. The quitclaim deed the government relies on is, in fact, for an entirely different property, a vacant lot that Mr. Balian has no interest in. He did not own the property and, obviously, he did not and could not have signed the quitclaim deed on March 9, 2018. (*See* Declaration of Craig H. Missakian, Ex. B.)

The government also argues that Mr. Balian "is still a high-risk for reoffending, given his connections to those engaging in criminal activity. Indeed, defendant appears to have surrounded himself with Armenian Organized Crime and the Mexican Mafia." (Government's Position, at 9.) It is unclear exactly what the government means by these allegations or who it is referring to but there is no evidence that Mr. Balian will have any contact with either Armenian Organized Crime or Mexican Mafia figures upon his release let alone commit any other offenses. And to seek a higher sentence based on mere speculation that he will is an affront to every notion of due process that exists in this country. If the government has its way, not only will Mr. Balian's sentence reflect what he did in the past but also for what it predicts he will do in the future before he does it. While that is the plot line of a Hollywood blockbuster, it is a notion that has no place here.

C. <u>The Court should reject the government's request for an upward departure based on the claims of CHS-3</u>

Speculation is no substitute for facts. And it is one thing to say Mr. Balian turned to "a life of crime" or to conjure images of him as an Armenian Organized Crime figure or a Mexican Mafia gang member; it is yet another thing to prove it

DEFENDANT'S RESPONSE TO GOVERNMENT'S POSITION RE SENTENCING

as the law requires. *See United States v. Gardenhire*, 784 F.3d 1277 (9th Cir., 2015). The government's request for an upward departure relies extensively on the farfetched and untested accusations of an as-of-yet unidentified cooperating witness (referred to as "CHS-3") in the government's original arrest warrant. As Mr. Balian explained in his sentencing position papers, there are good reasons to discount entirely anything that CHS-3 has to say.

CHS-3 is the same person that the government conceded could have been "confused" about Mr. Balian. *See* Under Seal Declaration of Craig H. Missakian, Ex. D, at 9 (where government conceded that CHS-3 could be confused). He is also the person whose story, as explained in defendant's sentencing position paper, is demonstrably false in several material respects. *See* Sentencing Position Paper of John Saro Balian, at 20-23 (discussing problems with CHS-3's story). On top of that, the government concedes that it is "not aware of any additional evidence to corroborate the information that CHS-3 provided," (Government's Position, at 10), and that it believes that CHS-3 is cooperating against Mr. Balian "in hopes of receiving consideration for his pending state and federal cases." (*See* Arrest Warrant Affidavit, at n.18 p. 29.)

Before the Court imposes an upward departure, fundamental fairness and the law require more than the uncorroborated statements of an unnamed person with a clear motive to lie whose story has already fallen apart in key respects. If, however, the Court is inclined to rely on any of these accusations for any purpose in arriving at a sentence, Mr. Balian respectfully requests an evidentiary hearing so that he can confront the witness and test his claims.

### D.  Sentencing disparity

The government mentions that the defendant in *United States v. Felix Cisneros Jr.*, CR No. 17-229-CAS went to trial and received a 12 month and one day sentence but never explains why a sentence of triple that is warranted here. Mr. Cisneros was involved with some of the very same individuals as Mr. Balian and

his actions involved similar conduct and charges to those involved here. Moreover, unlike Mr. Balian who accepted responsibility for his actions immediately, Mr. Cisneros showed little respect for the law by choosing to go to trial. There is simply no basis—other than the government's demonstrated animus toward Mr. Balian—for seeking a sentence of three times what Mr. Cisneros received. In fact, the Cisneros sentence is a compelling argument for why Mr. Balian should receive an even lesser punishment.

## III.   CONCLUSION

For all of the reasons discussed above, Mr. Balian respectfully requests that the Court reject the government's requested sentence and the probation department's recommendation and impose a sentence of time served and some amount of community service.

Dated: March 5, 2019                                    Respectfully submitted,

/s/ Craig Missakian

_____
Craig H. Missakian
Attorney for Defendant
John Saro Balian

Declaration of Craig H. Missakian

I, Craig Missakian, declare that:

    1.    I am an attorney licensed to practice before all of the courts of the State of California and defendant John Saro Balian's attorney in this case. I make the statements set forth below of my own personal knowledge and, if called upon to do so, would and could testify competently to the following facts.

    2.    In response to the government's suggestion that Mr. Balian had quitclaimed his home in order to frustrate law enforcement, I contacted a local real estate broker and asked him to provide me with information about Mr. Balian's home. Attached hereto and marked as Exhibit A is a true and correct copy of the property profile for Mr. Balian's residence that the broker provided (redacted to protect Mr. Balian's and his family's privacy). I have not had time to review Orange County property records personally to confirm what is reflected in Exhibit A, but I have no reason to question the accuracy of the information. Exhibit A shows that title to Mr. Balian's home, as of today, remains in his name.

    3.    I also gave the broker the number in paragraph 73 of the PSR (2018-0085717) that the government and probation officer state is the quitclaim deed Mr. Balian filed and recorded in San Bernardino County to transfer title to his home shortly before his arrest. Attached hereto and marked as Exhibit B is a true and correct copy of that quitclaim deed bearing number 2018-0085717 provided by the same broker, which I understand he obtained from Lawyers Title Company. The quitclaim deed relates to a vacant parcel of land in San Bernardino County and has nothing to do with Mr. Balian's home. Rather, it is a property that Mr. Balian's late daughter's boyfriend quitclaimed ***to her*** in December 2017, about a month before

///

///

///

///

10
DEFENDANT'S RESPONSE TO GOVERNMENT'S POSITION RE SENTENCING

her death. Mr. Balian is not the grantor on the deed and had no connection to the property at the time the quitclaim deed was executed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 5th day of March 2019 at Pasadena, California.

/s/ Craig Missakian

_____

Craig H. Missakian

DEFENDANT'S RESPONSE TO GOVERNMENT'S POSITION RE SENTENCING

**, Orange County**



| 3 | 1,400 | 5,200 | $340,000 |
|---|---|---|---|
| MLS Beds | MLS Sq Ft | Lot Sq Ft | MLS Sale Price |
| 3 | 1968 | SFR | 06/13/2000 |
| Baths | Yr Built | Type | MLS Sale Date |

## Owner Information

| | | | |
|---|---|---|---|
| Owner Name: | **Balian John S** | Tax Billing Zip+4: | |
| Mail Owner Name: | **John S Balian** | Owner Vesting: | **Divorced** |
| Tax Billing Address: | **(no mail)** | Owner Occupied: | **Yes** |
| Tax Billing City & State: | | No Mail Flag: | **Y** |
| Tax Billing Zip: | | | |

## Location Information

| | | | |
|---|---|---|---|
| Zip Code: | | School District: | |
| Carrier Route: | | Comm College District Code: | |
| Tract Number: | | Census Tract: | **1100.12** |

## Tax Information

| | | | |
|---|---|---|---|
| APN : | | Tax Area: | |
| Exemption(s): | **Homeowner** | Lot Number: | |
| % Improved: | **19%** | Water Tax Dist: | **0** |
| Legal Description: | | | |

## Assessment & Tax

| Assessment Year | 2018 | 2017 | 2016 |
|---|---|---|---|
| Assessed Value - Total | $459,265 | $450,260 | $441,432 |
| Assessed Value - Land | $370,051 | $362,795 | $355,682 |
| Assessed Value - Improved | $89,214 | $87,465 | $85,750 |
| YOY Assessed Change ($) | $9,005 | $8,828 | |
| YOY Assessed Change (%) | 2% | 2% | |

| Tax Year | Total Tax | Change ($) | Change (%) |
|---|---|---|---|
| 2016 | $5,243 | | |
| 2017 | $5,347 | $104 | 1.99% |
| 2018 | $5,463 | $117 | 2.18% |

| Special Assessments | Tax Amount |
|---|---|
| Ocsd Sewer User Fee | $335.00 |
| Mello-Roos R3 | $198.06 |
| Lighting Maint | $21.86 |
| Mwd Water Stdby Chg | $10.08 |
| Mosq/Fire Ant Assmt | $7.48 |
| Vector Control Chg | $1.92 |
| Total Of Special Assessments | $574.40 |

## Characteristics

| | | | |
|---|---|---|---|
| County Land Use: | **Single Fam Residence** | Quality: | **Average** |
| Universal Land Use: | **SFR** | Water: | **Public** |
| Lot Frontage: | **52** | Sewer: | **Public Service** |
| Lot Depth: | **100** | Heat Type: | **Central** |
| Lot Acres: | **0.1194** | Patio Type: | **Covered Patio** |

**Courtesy of Nerses Ananyan, Titus Realty, Inc., California Regional MLS - CN**
The data within this report is compiled by CoreLogic from public and private sources. The data is deemed reliable, but is not guaranteed. The accuracy of the data contained herein can be independently verified by the recipient of this report with the applicable county or mun cipality.

EXHIBIT A12

**Property Detail**

| Lot Area: | 5,950 | Garage Capacity: | 1 |
|---|---|---|---|
| Style: | **Contemporary** | Garage Sq Ft: | **483** |
| Building Sq Ft: | **1,400** | Parking Type: | **Attached Garage/Carport** |
| Gross Area: | **1,883** | No. Parking Spaces: | **MLS: 2** |
| Stories: | **1** | Roof Material: | **Wood Shake** |
| Total Rooms: | **6** | Construction: | **Frame** |
| Bedrooms: | **3** | Exterior: | **Stucco** |
| Total Baths: | **Tax: 3 MLS: 2** | Year Built: | **Tax: 1968 MLS: 1967** |
| Full Baths: | **2** | Other Impvs: | **Covered Patio, Fence** |
| Half Baths: | **1** | Equipment: | **Dishwasher, Range Oven, Disposal, Range Hood** |
| Other Rooms: | **Family Room** | Building Type: | **Single Family** |
| Fireplaces: | **1** | # of Buildings: | **1** |
| Condition: | **Good** | | |

## Estimated Value

| RealAVM™ (1): | **$799,900** | Confidence Score (2): | **59** |
|---|---|---|---|
| RealAVM™ Range: | **$727,909 - $871,891** | Forecast Standard Deviation (3): | **9** |
| Value As Of: | **02/19/2019** | | |

(1) RealAVM™ is a CoreLogic® derived value and should not be used in lieu of an appraisal.

(2) The Confidence Score is a measure of the extent to which sales data, property information, and comparable sales support the property valuation analysis process. The confidence score range is 60 - 100. Clear and consistent quality and quantity of data drive higher confidence scores while lower confidence scores indicate diversity in data, lower quality and quantity of data, and/or limited similarity of the subject property to comparable sales.

(3) The FSD denotes confidence in an AVM estimate and uses a consistent scale and meaning to generate a standardized confidence metric. The FSD is a statistic that measures the likely range or dispersion an AVM estimate will fall within, based on the consistency of the information available to the AVM at the time of estimation. The FSD can be used to create confidence that the true value has a statistical degree of certainty.

## Listing Information

| MLS Listing Number: | | MLS Pending Date: | **05/14/2000** |
|---|---|---|---|
| MLS Status: | **Sold** | Closing Date: | **06/13/2000** |
| MLS Status Change Date: | **06/14/2000** | MLS Sale Price : | **$340,000** |
| MLS Area: | | MLS Listing Agent: | **Mrm-Srusssha-Sharon Russell** |
| MLS Listing Price: | **$335,000** | MLS Listing Broker: | **SEAL BEACH REALTY** |
| MLS Orig. List Price: | **$344,900** | | |

| MLS Listing # | S212517 |
|---|---|
| **MLS Status** | Closed |
| **MLS Listing Date** | 04/28/2000 |
| **MLS Listing Price** | $335,000 |
| **MLS Orig Listing Price** | $335,000 |
| **MLS Close Date** | 06/13/2000 |
| **MLS Close Price** | $340,000 |
| **MLS Listing Cancellation Date** | 06/13/2000 |

## Last Market Sale & Sales History

| Recording Date: | **06/13/2000** | Sale Type: | **Full** |
|---|---|---|---|
| Sale Date: | **Tax: 05/18/2000 MLS: 06/13/2000** | Deed Type: | **Grant Deed** |
| Sale Price: | **$340,000** | Owner Name: | **Balian John S** |
| Price Per Square Feet: | **$242.86** | Seller: | **Balian John** |
| Document #: | **310786** | | |

| Recording Date | 06/13/2000 | 12/23/1992 | 12/23/1992 | 03/14/1979 |
|---|---|---|---|---|
| **Sale Date** | 05/18/2000 | | | |
| **Sale Price** | $340,000 | $272,000 | | $91,000 |
| **Nominal** | | | Y | |
| **Buyer Name** | Balian John S | Fitzgerald James Scott | Salls Nadean | |
| **Seller Name** | Balian John | Sorensen Nadean | Sorensen Nadean | |
| **Document Number** | | | | |
| **Document Type** | Grant Deed | Grant Deed | Grant Deed | Deed (Reg) |

## Mortgage History

**Courtesy of Nerses Ananyan, Titus Realty, Inc., California Regional MLS - CN**
The data within this report is compiled by CoreLogic from public and private sources. The data is deemed reliable, but is not guaranteed. The accuracy of the data contained herein can be independently verified by the recipient of this report with the applicable county or mun cipality.

**Property Detail**
Generated on 03/04/2019
Page 2 of 3

EXHIBIT A13

| Mortgage Date | 09/23/2004 | | 09/24/2004 | | |
|---|---|---|---|---|---|
| Mortgage Amount | $170,000 | $75,000 | $469,170 | $155,000 | $99,000 |
| Mortgage Lender | | Private Individual | Pnc Mtg | Countrywide Bk | Americas Wholesale Lender |
| Mortgage Code | Private Party Lender | Private Party Lender | Conventional | Conventional | Conventional |

| Mortgage Date | 09/23/2004 | 09/23/2004 | 02/23/2004 |
|---|---|---|---|
| Mortgage Amount | $35,000 | $477,000 | $100,000 |
| Mortgage Lender | National Cty Bk | Accubanc Mtg | Americas Wholesale Lender |
| Mortgage Code | Conventional | Conventional | Conventional |

## Foreclosure History

| Document Type | Release Of Lis Pendens/Notice | Notice Of Default |
|---|---|---|
| Default Date | | 07/29/2010 |
| Foreclosure Filing Date | | 07/29/2010 |
| Recording Date | 05/27/2011 | 07/30/2010 |
| Document Number | | |
| Default Amount | | $18,234 |
| Original Doc Date | 07/30/2010 | 09/23/2004 |
| Original Document Number | | |

## Property Map





*Lot Dimensions are Estimated

Courtesy of Nerses Ananyan, Titus Realty, Inc., California Regional MLS - CN
The data within this report is compiled by CoreLogic from public and private sources. The data is deemed reliable, but is not guaranteed. The accuracy of the data contained herein can be independently verified by the recipient of this report with the applicable county or mun cipality.

EXHIBIT A14

**Property Detail**
Generated on 03/04/2019
Page 3 of 3



Recorded in Official Records, County of San Bernardino   3/09/2018
3:42 PM
NC
SAN

**BOB DUTTON**
ASSESSOR – RECORDER – CLERK

**C Priority Mail**

Doc# **2018-0085717**

| Titles | 1 | Pages | 2 |
|---|---|---|---|
| Fees | | | 27.00 |
| Taxes | | | 2.75 |
| CA SB2 Fee | | | 0.00 |
| Others | | | 6.00 |
| Paid | | | $35.75 |

Recording Requested by:
ROBERT CLARK PENNER

When recorded mail to:
Alexzandria R. Figueroa
4616 Guava Ave.
Seal Beach, CA 90740

Mail Tax Statement to:
(Same as above)

---

## QUITCLAIM DEED

APN: 0631-132-10

THE UNDERSIGNED DECLARE ~~S~~ Grantors DOCUMENTARY TRANSFER TAX IS #2.75 /Kevin R~~
computed on full value of property conveyed.

NOW THEREFORE, Lynn J. Penner, formally known as Merilynn J. Penner and Robert Clark Penner, as successor trustees of the Penner Family Trust dated April 2, 1975 and as the named successor trustees in that Deed recorded on April 11, 1975 in the County of San Bernardino, Instrument No. 485, hereby grant to **Alexzandria R. Figueroa** all interests in the following described real property situated in the County of San Bernardino, State of California, described as:

The West one-half of the Northeast one-quarter of the Southwest one-quarter of the Northeast one-quarter of Section 34, Township 2 North, Range 6 East, San Bernardino Meridian.

Property is a vacant lot in the County of San Bernardino, State of California   —   APN: 0631-132-10

Dated: 22 DEC , 2017

_____
Lynn J. Penner

Dated: 18 Dec , 2017

_____
Robert Clark Penner

---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA        )
COUNTY OF   LOS ANGELES    )

On Dec 15 , 2017, before me, G. Gasperian, Notary Public, personally appeared Robert Clark Penner who proved to me on the basis of satisfactory evidence to be the person whose name is/are subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/~~their authorized capacity, and that by his/~~her/their~~ signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing is true and correct.

WITNESS my hand and official seal.



G. GASPERIAN
Notary Public – California
Los Angeles County
Commission # 2198534
My Comm. Expires Jun 18, 2021



Signature _____ (seal)

---

Order: QuickView_
Doc: 2018-85717

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _San Diego_____ )

On _Jan 22   2018_____ before me, _BRANDON Lee Thomas Notary Public_
(insert name and title of the officer)

personally appeared ___Lynn Jean Penner___,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

(Seal)

BRANDON LEE THOMAS
Commission # 2064119
Notary Public - California
San Diego County
My Comm. Expires Apr 11, 2018

EXHIBIT B16
Page 2 of 2